[Civ. No. 1666. Fourth Appellate District.—February 6, 1937.]

BISHOP'S SCHOOL UPON THE SCRIPPS FOUNDATION (a Corporation), Appellant, v. ARTHUR C. WELLS et al., as Executors, etc., Respondents; HELEN NORTH STROUT et al., Interveners and Respondents.

142

Hillyer & Boldman for Appellant.

Laurence H. Smith and Vernon Bettin for Interveners and Respondent.

MARKS, J.—Plaintiff brought this action to recover possession of 126 shares of the common stock and 33 shares of the preferred stock of the Western Metal Supply Company or $13,000, their alleged value, in case delivery could not be had. Interveners are the heirs at law of Wheeler J. Bailey, deceased, and defendants are executors of his last will. Judgment went for defendants and interveners and plaintiff has appealed.

Deceased was a resident of La Jolla in the city of San Diego and for several years had been secretary and treasurer of plaintiff, a charitable educational corporation with its school in the same location.

For four and one-half years prior to his death Mr. Bailey had lived with Miriam North, his step-niece, who drove his automobile and acted in the capacity of his confidential secretary. Deceased had a safe deposit box in the First National Trust & Savings Bank of San Diego in downtown San

Diego, where he kept his securities. Miss North had a safe deposit box in La Jolla where she kept hers.

Some weeks before his death on March 6, 1935, deceased took steps to make an adjustment of his earthly affairs. He had numerous conferences with his attorney and defendant Wells concerning the disposition of his property. Several drafts of a will were prepared in the earlier of which disposition was made of the stock in question here. In the final draft which was executed no mention was made of this stock for the reason that deceased told his advisers that he intended to give this stock to plaintiff either absolutely or in the form of a trust for its benefit.

The will was executed on February 21, 1935. About two days later deceased had Miss North drive him to the First National Trust & Savings Bank of San Diego where he took from his safe deposit box the stock in question here and other securities, each in separate envelopes. He made notations on the envelope containing the Western Metal Supply Company stock which, although dated and in his handwriting, were not signed by him. He had Miss North drive him to her bank in La Jolla where he gave her the envelope containing the Western Metal Supply Company stock and envelopes containing other securities, all of which were placed in Miss North's box.

On February 25, 1935, deceased dictated to Miss North and she wrote on her typewriter the following letter:

"February 25, 1935.

"The Finance Committee of the
  Bishop's School,
"La Jolla, Calif.
"Dear Sirs:    Attention Mr. J. C. Harper.

"I have brought out certificates of stock both common and preferred of the Western Metal and Supply Co. which I wish to present to the School, the income to be used for a maintenance fund for the library and the residue of such income to be added to the Scholarship Fund. Yours truly."

On March 2, 1935, this letter was subscribed and sworn to by deceased before a notary public. It was not otherwise witnessed nor attested. It was not delivered to the school but was found with the stock after Mr. Bailey's death.

Miss North was the only living person who had any knowledge of what transpired when the stock was placed in her

safe deposit box. Her testimony concerning this happening is as follows:

"Q. In the month of February, of this year, did you have any transaction with Mr. Bailey relating to some Western Metal Supply Company stock? A. Yes. Q. Where did that take place? A. In San Diego, or La Jolla; he gave me the stock which he had gotten from his box in San Diego, and gave it to me in La Jolla to put in my box. Q. What did the stock consist of? A. I don't know the number—I didn't look inside of the envelope. He just gave me the envelope to put in my box. . . . Q. Then I understand Mr. Bailey handed you an envelope and which you subsequently found contained these certificates of stock of the Western Metal Supply Company? A. I never took the stock out; it was written on the envelope what was in it, but I never opened it. Q. I show you this document and ask you; is that the envelope to which you refer? A. I think so, that is his writing. . . . Q. And did you ever examine the contents of this envelope prior to Mr. Bailey's death? A. I did not. Q. When Mr. Bailey gave you this envelope, what did he say to you? A. He asked me to put it in my box in La Jolla, at the bank. Q. Then when did you next see this document, this envelope? A. When the executors asked for it. Q. You took it out of your own safe deposit box? A. The executor went with me; I went with Mr. Wells; Mr. Wells was there. Q. That was after Mr. Bailey's death? A. Yes, sir. Q. And were the contents disturbed during the time between the time when you received the envelope from Mr. Bailey, and the time you handed it to Mr. Wells? A. No. Q. Was it opened in your presence? A. I am not sure. I presume it was, but I cannot remember. . . . Q. Did you receive from Mr. Bailey a document in the words of this typewritten document, which I am handing you? A. I think I wrote it for Mr. Bailey on my typewriter. . . . Q. All right. You have told us all that was said at the time the envelope was given you? A. Yes. . . . Q. You had some other securities belonging to Mr. Bailey in your box? A. Yes. Q. After he died, didn't you? A. Yes. Q. And what was the circumstance of your having those securities in that box? A. He took them from his box at the same time he took the Western Metal because it was difficult for him to go to the First National. So he could get them more easily, he asked me to keep these in my box.

Q. When he gave this envelope to you, did he give it to you separately, or was it with a group of other securities? A. A group of other securities. Q. You don't know whether that envelope was in there from your knowledge, except you found it in there afterwards? A. Oh, no, the other securities were in a separate envelope, but the envelopes were all together. Q. And it was always customary for you to keep these securities in your own box at his request and deliver them to him if and when he wanted them? A. Yes, at that particular time, along at that particular time, is all. Q. He told you to take them down to your box; he didn't say, 'I'll give these to you,' and you understood they were his securities? A. Oh, they were his, absolutely. Q. Didn't he say to you when he handed these to you, in reference to that particular envelope, that he did not want to let go of possession of that security or securities, he was giving you, or words to that effect? A. I think that was his idea, at that particular time. Mr. Hillyer: I move to strike the answer out. (Question and answer read by reporter.) The Court: Motion granted. Q. Was that the substance of the conversation? A. Yes. . . . Q. Did he ever instruct you to give that envelope to anybody? A. No. Q. He did not instruct you to give it to the Bishop's School? A. No. . . . Q. Miss North, just as nearly as you can will you give the entire conversation in substance that took place at the time Mr. Bailey gave you the envelope? . . . A. He handed it to me and asked me to put it in my box. Q. Did he say anything else? A. No, I don't think he did, not definitely. Q. Not at that time? A. No. Q. Did he say anything to you before that time about it? A. Well, I know—I cannot say exactly what he said; I know what his intentions were; I can give you— . . . Q. (Interrupting.) Now, listen, please. I am asking you not what his intentions were, but what he said to you. A. I cannot tell absolutely. At this particular time you mean? Q. Do the best you can; as far as you can recall at the particular time of the delivery of the document, did he tell you to put it in your box? A. At that time, yes, sir. Q. Before that time had he ever talked to you about this stock? A. Yes, sir. Q. What did he say about it? A. He said he would like to have the Bishop School have it sometime. Q. Anything else that you recall? A. No, I don't think so. Q. After he gave you the stock, did he say anything to you

about it? A. No, that he asked me to put it in the box. Q. After that, did you ever talk to him about it again that you recall? A. Not definitely. He may have mentioned it at some time, but I cannot remember; no."

There are only three possible theories under which the attempted transfer of the stock to the school might be sustained. They are, first, a testamentary disposition; second, a gift; and third, the creation of a trust of which the school was beneficiary.

■ That there was no valid testamentary disposition of the stock is evident from what we have already said. A bequest of it to the school was not included within the provisions of the will of deceased. The memorandum on the envelope, while in the handwriting of deceased and dated, was not signed by him. The letter of February 25th was typewritten and was not witnessed as is required of a will.

■ Further, his death occurred within thirty days from the execution of the three documents. Under such circumstances the school, being a charitable corporation, could not take under any of the documents had they been duly executed testaments. (Sec. 41, Probate Code; *Estate of Bailey*, (*Bishop's School* v. *Wells*), *ante*, p. 135 [65 Pac. (2d) 102].)

■ Among the elements necessary to constitute a valid gift *inter vivos* are first, an intention on the part of the donor to make a gift, and second, a delivery either actual or symbolical amounting to a present transfer of title. (*Estate of McEuen*, 18 Cal. App. (2d) 180 [63 Pac. (2d) 332]; *Sullivan* v. *Shea*, 32 Cal. App. 369 [162 Pac. 925].) In the Sullivan case, it was said:

"The elements essential to constitute a valid gift are an intention to give, and the delivery, either actual or symbolical, of the thing intended to be given. Neither alone is sufficient. The rule is very clearly set forth in the case of *Jones* v. *Falls*, 101 Mo. App. 536 [73 S. W. 903], where it is said: 'To constitute a valid gift *inter vivos* there must be an intention to give and a delivery to the donee, or to someone for him, of the property given. An intention of the donor to give is not alone sufficient. The intention must be executed by a complete and unconditional delivery. Neither will a delivery be sufficient unless made with the intention to give.' (See, also, *Beaver* v. *Beaver*, 117 N. Y. 421 [15 Am. St. Rep. 531,

6 L. R. A. 403, 22 N. E. 940]; *Knight* v. *Tripp*, 121 Cal. 674, 678 [54 Pac. 267]; *Pullen* v. *Placer County Bank*, 138 Cal. 169, 170 [94 Am. St. Rep. 19, 66 Pac. 740, 71 Pac. 83].) . . .

"The burden of proving a gift is upon the donee. (*Lehr* v. *Jones*, 74 App. Div. 54 [77 N. Y. Supp. 213]; *Thomas* v. *Tilley*, 147 Ala. 189 [41 So. 854]; *Brady* v. *O'Rourke*, 89 App. Div. 400 [85 N. Y. Supp. 907].)

"It is also said to be the rule that where a claim of gift is asserted after the death of a donor, every element necessary to constitute a gift must be sustained by explicit and convincing evidence." (See, also, *Estate of Hall*, 154 Cal. 527 [98 Pac. 269]; *Zeller* v. *Jordan*, 105 Cal. 143 [38 Pac. 640]; *Mutual Benefit Life Ins. Co.* v. *Clark*, 81 Cal. App. 546 [254 Pac. 306]; *Lo Presti* v. *Manning*, 125 Cal. App. 442 [13 Pac. (2d) 1002].)

■ The evidence thoroughly establishes a desire and intention on the part of deceased that the school should have the stock. It fails to show either an actual or symbolical delivery of the stock to the school or to anyone for it. Deceased had Miss North place the stock in her safe deposit box for his own convenience. He neither parted with possession of it nor control over it. The certificates were not endorsed by him. They were placed in the box with other securities belonging to him and which he continued to own and control. There is no reason for concluding that there was any more effectual delivery of the Western Metal Supply Company stock to the school than of the other securities which he had placed in the box at the same time and under identical circumstances. The school asserts no claim to the other securities.

■ Appellant suggests that as deceased was an officer of the school at the time the stock was placed in Miss North's safe deposit box the delivery was complete as he then held the stock as an officer of the school and not in his individual capacity. This argument is ingenious if not convincing. All of the evidence is to the effect that deceased expressed an intent to make a future gift. There is nothing to indicate that the gift was actually completed by delivery.

This last argument is effectually negatived in the case of *Giselman* v. *Starr*, 106 Cal. 651 [40 Pac. 8]. In that case a father who was guardian of his incompetent daughter expressed an intention of giving her a note and mortgage, thus providing her with support. In an inventory of her estate,

verified by the father, the note and mortgage were returned as property of the estate of the daughter. In holding this evidence insufficient to establish a gift, the Supreme Court said:

"This array of facts and circumstances makes a strong presentation of the intent of Hastings to give the note and mortgage to his daughter. It is established that upon one occasion, under oath, he declared them to be her property. But such a declaration, however binding in good morals, is not of itself sufficient to establish a gift. No legal duty was imposed upon Hastings to give this particular property to his daughter, and, if the intended donation lacked anything of consummation, the promises or declarations were but *nudum pactum* and not enforceable. It is not here a question of acceptance of the gift by the incompetent which, the gift being advantageous to her, the law would presume; but the question is whether the gift was so completely made as to enable the law to presume its acceptance. To every gift delivery is essential. . . . The Civil Code declares that 'a verbal gift is not valid, unless the means of obtaining possession and control of the thing are given, nor, if it is capable of delivery, unless there is an actual or symbolical delivery of the thing to the donee.' (Civ. Code, sec. 1147.) Hastings' attempted or intended gift fell short of these requirements. Lacking his indorsement of the note, his possession remained a possession in his personal and not in his representative character, and the gift failed of completion."

The theory of a trust established for the benefit of the school is also untenable. In order to create an express trust there must be an intention on the part of the trustor to create a trust and of a trustee to accept the trust. (Secs. 2221 and 2222, Civ. Code.) Both elements are lacking in the instant case.

The complaint is not drawn on the theory of the existence of a trust. There is nothing in the record even suggesting that deceased attempted to create a trust. His only intention disclosed at the time the stock was placed in the La Jolla bank was to make a gift of it. In *Noble* v. *Learned,* 153 Cal. 245 [94 Pac. 1047], it was said:

"An ineffectual attempt to make a gift does not create a trust, and equity will not perfect an imperfect gift by establishing a trust where none was in contemplation."

There was not proved any intention to vest title in a trustee which is a necessary element of a valid trust. There was no evidence of an acceptance of the trust by Miss North or by any other person.

The evidence fails to disclose any legal theory upon which appellant can acquire title to the property in question. As it was not the owner of the stock and had no interest in it its suit must fail.

The decree or order of the probate court under review here is affirmed.

Barnard, P. J., and Jennings, J. concurred.