109 Cal.App.2d 42 (1952)
Estate of HAREKLEA LEKOS, Deceased. CONSTANTINE VAGANAS, Contestant and Appellant,
v.
JOHN ANGELONIDES et al., Proponents and Appellants.
Civ. No. 14793. 
California Court of Appeals. First Dist., Div. One. 
Jan. 30, 1952.
 Charles A. Christin for Contestant and Appellant.
 Stanley P. Mamalakis for Proponents and Appellants. *44
 WOOD (Fred B.), J.
 Hareklea Lekos died September 19, 1948. Her nearest relatives, surviving her, were two sisters, two brothers, and an adopted sister.
 A purported will was presented for probate by John Angelonides, husband of decedent's sister Chresanthe. Constantine Vaganas, a brother of decedent, filed a contest, upon five grounds. A nonsuit was granted as to the allegations that the will was not duly executed and that decedent was not aware of its testamentary character. A verdict was directed against contestant in respect to the charge that it was procured by fraudulent representations. The jury returned special verdicts to the effect that decedent was of sound mind but that the will was procured by undue influence.
 John and Chresanthe Angelonides moved in the alternative for judgment notwithstanding the verdict or for new trial. The court denied the motion for judgment, entered judgment on the verdict, and granted the motion for new trial for insufficiency of evidence.
 Contestant, Constantine Vaganas, appeals from the order granting a new trial; proponents, John and Chresanthe Angelonides, from the judgment entered on the special verdict and from the order denying their motion for judgment not withstanding the verdict.
 [1, 2] (1) As to contestant's appeal, it is important to bear in mind that " 'The granting of or refusal to grant a new trial rests very largely within the discretion of the trial court--a discretion which is extremely wide; and its ruling will not be disturbed, especially where, as here, a new trial has been granted on the insufficiency of the evidence, unless there is a clear and affirmative showing of a gross, manifest or unmistakable abuse of the discretion it is called upon to exercise. ... Furthermore, ... in considering such a motion it is not only the trial court's province but its duty to scrutinize and to weigh the evidence, and if in its opinion the facts upon which the decision of the jury is based are insufficient to justify that decision, or if it believes that the weight of the evidence is against the decision, a new trial should be granted even though the inferences it may draw are opposed to those drawn by the jury.' " (Devens v. Goldberg, 96 Cal.App.2d 539, 542 [215 P.2d 935].)
 By this will, executed July 17, 1948, decedent gave $3,000 to certain charities and the remainder of her estate to Chresanthe and John "for the benefit of their children, Peter and Irene"; upon John's death, all to Chresanthe for life; upon *45 Chresanthe's death, one half to Peter and Irene, the other half to John and upon his death to Peter and Irene. It was not dissimilar in pattern to a will of June 14, 1947, in which she left her property to her sister, Adamantia Couris and Chresanthe; Adamantia's share to go to her husband, Chresanthe's to her children, if either predeceased the decedent. Contestant was not a beneficiary under either will.
 There was no direct evidence of undue influence. The evidence upon which contestant relies is circumstantial. He claims it is substantial and without conflict.
 Contestant testified that decedent told him she had made a will, leaving her property "Equal to every one of us," but another witness said contestant told her she had left it to the children of Mr. and Mrs. Angelonides. [3] Evidence of declarations of a decedent though admitted without objection, is of inconsiderable weight, and in this instance conflicting.
 [4] Contestant also testified that decedent said the Angelonides told her something about him, against him, but that she did not believe them. That falls short of compelling the conclusion that they prevented her from disposing of her property in accordance with her wishes.
 Contestant invokes his own testimony and that of his wife tending to show weakness of mind short of testamentary incapacity, but that is counterbalanced by other testimony of opposite import.
 Contestant relies upon a number of other circumstances which, for reasons similar to those we have discussed, fall short of establishing undue influence as a matter of law. It was the province of the trial court, not that of a reviewing court, to determine the weight and bearing of those circumstances.
 From 1935 to 1947, decedent and her husband, Mike Lekos, operated a food market and managed real estate in Oakland. Shortly after Mike's death, she moved to San Francisco, taking her meals with the Angelonides, and after October, 1947, lived at their home. During that period she made trips to Oakland to visit friends and to see her attorney. Contestant claims that when she moved from Oakland he did not know where she was; that he was not informed by the relatives; nor did they advise him of her illness. But there is evidence that he had ready avenues of inquiry which apparently he did not pursue, and that the relationship between the Lekos and Vaganas families had never been close. Mrs. Lukas, the adopted sister, testified that in 1935 before coming to this *46 country decedent had a quarrel with contestant and after that never mentioned contestant to the witness, yet frequently mentioned her sister Chresanthe whom she loved a great deal. H. S. Henion, the attorney who drew the will (he had been the Lekos' attorney for 30 years) testified: "of all the years that I knew Mrs. Lekos and I knew Mike, ... this brother here [contestant] was never mentioned. ... I didn't know until after her death that this brother here existed."
 About ten days before the execution of the will decedent told Henion she contemplated making a will. No other person was present on that occasion. A few days later she sent him word through her brother-in-law, Sam Couris, to come and take instructions for a new will. He then went to her home with Couris, who was present during the interview. Decedent told Henion she wanted to change her will; wanted to remember the orphans in Greece, and to be sure that Peter and Irene were taken care of because she was very fond of them; wanted her property to go to them for their education and benefit but as they were children she wanted John and his wife to have a life estate and when they died it would pass to the children. There is evidence that she gave him these instructions directly, not through Couris, and that she spoke English and understood it if one spoke slowly and pronounced carefully.
 When the will had been drafted, Henion took it to decedent, picking up Couris en route, and one Felix Levy, an employee of Couris, to serve as a witness. Henion said he read the will and explained it to decedent, step by step. He did not merely read it. He read and explained it, and asked her if she understood it and she said yes, and he would take up the next paragraph. Then Sam Couris read it to her in Greek. He would read it in English and then translate it into Greek. Henion then asked her if it was entirely satisfactory. She said, "Yes." Asked if she wanted to sign it, she said, "Yes," and did sign it.
 There was evidence that the relationship between decedent and the Couris and Angelonides families was such as to afford an opportunity to influence the testamentary act. After her husband died, she consulted Sam Couris in the management of her affairs. She was living at the Angelonides home when the will was executed. During May and June, 1948, decedent delivered three of her bonds to Sam Couris. He used the proceeds, $31,000, together with $10,000 of his and John's funds to construct buildings on land belonging to *47 Sam and John. Sam testified that she offered him the money to build a home for her and "cabins for us, to have an income and return the money to her out of the income" and he agreed to pay her back out of the income; and that he keeps the income in a special bank account, separate from other funds. In April, 1948, she delivered to Sam a power of attorney, authorizing Sam and John in her name to deposit her bonds for payment and to collect and use the proceeds thereof. It is not entirely clear from the record that Sam ever used this power of attorney. John said he did not know about the power of attorney until the trial; that Sam took care of the business and he, John, did not know what kind of agreement Sam had with decedent concerning the money. There is no direct evidence that any of the beneficiaries under the will participated in its making or knew its provisions, or that Sam Couris tried to influence decedent in selecting her beneficiaries.
 The will was not an unnatural one, in view of decedent's expressed interest in the children, Peter and Irene. Peter lived with decedent for some time when a young child, and was at the Lekos home and store frequently. The will comported with the general plan of an earlier will save for the omission of the sister Adamantia Couris, who was an incompetent. Adamantia's son was also an incompetent, committed to a state institution.
 We cannot say as a matter of law that the trial judge was not justified in finding the weight of the evidence insufficient to prove that the will was procured by undue influence. The order for new trial should be affirmed.
 [5] (2) The order denying proponents' motion for judgment notwithstanding the verdict, made after denial of their motion for a directed verdict, is not appealable, but may be reviewed upon contestant's appeal from the order granting a new trial. (Estate of Green, 25 Cal.2d 535, 545 and 546 [154 P.2d 692].)
 [6] The principles which govern the review of such an order are well stated in Estate of Green, supra, quoting from Card v. Boms, 210 Cal. 200, 202 [291 P. 190], as follows: " 'The right of the trial court to set aside a verdict and enter a contrary judgment is absolutely the same as its right to grant a nonsuit. [Citing authorities.] The court should, therefore, grant such a motion when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging *48 in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff. [Citing authorities.]' " (25 Cal.2d at p. 546.)
 Our examination of the record in the light of these principles convinces us that the trial court committed no error in denying the motion for judgment notwithstanding the verdict. There was a combination of circumstances which, taken together, with the reasonably deducible inferences, furnish evidence of sufficient substantiality to support the verdict.
 There was evidence that the relations between contestant and decedent and her husband had always been friendly. Also, contestant's relations with the Angelonides and Couris families had been friendly until some time in 1946 when a discussion occurred between contestant and Sam Couris concerning the manner in which the latter was handling the Couris community property (Mrs. Couris, an incompetent, was contestant's sister and Sam was her guardian), whereupon Sam terminated contestant's services as accountant for him.
 Decedent's husband died in March, 1947. A little over a month later, decedent left her home in Oakland and took up her residence at the Couris home at San Francisco, having her meals at the Angelonides home until October, 1947, when she moved to the Angelonides home, where she stayed until taken to the hospital during her last illness. Contestant testified that when decedent left Oakland he tried repeatedly to get in contact with her but was unable to find her; that he finally learned from some people in Oakland and went to see her around August 10, 1948. She was in bed, in pain, and could not get up. The Couris and Angelonides families had been aware of the serious character of decedent's illness for some little time but did not inform contestant of her illness. During that first visit, decedent told contestant she had tried to get him and could not find him, said she told Chresanthe to call and get in touch with him but the latter had reported there was nobody there, that she could not get contestant. During that period contestant's telephone would ring but as soon as he or his wife answered, the party calling would hang up, which did not occur after decedent's death. Contestant said that when he went to the house that day, Chresanthe "didn't say anything, but she was not so pleasant to see me," "didn't want me to see my sister alone," though she did leave him alone with the decedent about 10 *49 minutes. Contestant had a conversation with Chresanthe the day after decedent died in which she told him "they didn't want my sister [decedent] to go over in Oakland and see her friends" because "they have some friends who was single and they wanted to marry my sister Hareklea to this man for the benefit of themselves when she dies" and "that is the time she told me they tried to persuade her [decedent] not to go over to Oakland to see those people, and also of Carcouris ... one of the friends of hers have a son by the name of Carcouris who was a lawyer. They were afraid maybe he would make the will and benefit himself more than anybody else so they tried to keep her close her[e] in San Francisco instead of letting her go to Oakland."
 Concerning decedent's mental condition as bearing upon her susceptibility to influence as distinguished from testamentary capacity, there was evidence that the sudden death of her husband in March, 1947, was a great shock to her, with the result that she talked of "something and then something else she answered." She could not carry on a conversation. At the time of contestant's visit with her on August 10, 1948, her mental condition was still "muddled." When contestant's wife visited decedent July 31 or August 1, 1948, physically decedent was very sick, said she could not sleep because of the pain. She was not speaking very clearly. In her conversation she would go from one subject to another.
 In September, 1948, when contestant and his wife were visiting decedent at the hospital, decedent said, according to contestant: " 'I arrange things and I make my will and Chresanthe and John told me something about you,' she says, 'but I don't believe them. Against you, but I don't believe them at the time.' When she was making her will." She also said to contestant that she left the property "equally to everyone" ... "equal to every one of us." Contestant's wife testified that he asked decedent if she had a will and decedent responded: " 'Yes, Gus, I have it, and I leave equally for your share and for the brother in Greece and the six children,' and then they talk Greek again. They say Chresanthe and John. They take [talk] more again, but I am not listening. She say, 'I leave my will--everything in the will to everyone.' "
 There is evidence from which a jury could find that Couris and Angelonides occupied a confidential relationship toward the decedent. Proponents, in their brief, concede this as to Couris, in these words: "Sam Couris was the only member *50 of the family who spoke good English. The English of Mr. Angelonides, his wife's and that of the testatrix was very poor. For that reason, Sam Couris acted in the capacity of the leader in the family. He was in the grocery business with John Angelonides, and all the management was done by him. Couris and Angelonides purchased some lots in Sonoma County and Couris was the one who made all the arrangements for the financing and building on the lots. After the testatrix' husband died, Sam Couris assisted his sister-in-law in the management of her affairs. In a few words, Sam Couris could be adequately described as the public relations man for the entire family." This family leadership quality points, also, to the possibility that Couris may have acted on behalf of Angelonides as well as in his own behalf, in the influence, if any, which he exercised over the decedent.
 Sam's activities in connection with the preparation or execution of a will of the decedent are evidenced as early as June 17, 1947, when he accompanied her to the office of her attorney in Oakland upon the occasion of the execution of her first will, June 17, 1947. Sam was not present when the decedent previously gave her instructions concerning that will. He was present on the day of its execution. That was the will by which decedent gave half of her property to her sister, Adamantia Couris, and if the latter died before distribution, that half to Sam Couris, the other half to her sister, Chresanthe Angelonides, and if she died before distribution, her share to her children, Peter and Irene. That was about a year after the break between contestant and Sam Couris and the severance of their business relations.
 Concerning the will of July 17, 1948, Sam was present when decedent gave her instructions to her attorney, as well as the day when she executed it. Concerning the giving of instructions for the will, Sam testified that he interpreted from English to Greek and from Greek to English for the attorney and for decedent and was in the room with them throughout that interview; that decedent had previously told him she wished to change her first will and for him to ring up the attorney and get him over there; and that prior to this interview with the attorney, on the same day or the day before, decedent told Sam how she wanted the new will to be drawn. In discussing it she said how she wanted to make the will. Sam said decedent understood English a little, not much. Concerning the conference the day the will was executed, Henion testified that the will with those life estates was complicated; *51 decedent could not read English; that he did not read the life estate provisions of the will to her; that he would not attempt to do so even to an average English speaking person, he would explain it to them as he did to decedent; that he left it to Sam Couris to translate it into Greek, but that he, Henion, went through it, step by step, because he realized by going through it that way, decedent would understand it more clearly than if he read it off in legal phraseology; that he read it and explained it to her step by step and asked if she understood it and she said "yes" and then he took up the next paragraph or sentence; then Couris took the document and read it to her in Greek, reading it in English and then translating it into Greek. Henion also said that at neither of these conferences did anyone mention the contestant in his presence, so far as he knew; that the other two were talking Greek rapidly and one could not catch the names of any of the relatives if they were mentioned; nor did he hear mentioned the name of decedent's brother who was in Greece, nor the name of the sister, Adamantia Couris (save when the instruction was given him about leaving her out and about leaving out some other members of the family); nor was anything said about the power of attorney to Sam and John, nor about decedent's having given Couris money to build the cottages; that he, Henion, just followed out decedent's wishes and asked no questions and made no statements. Incidentally, it is observable that the 1948 will includes a direction to the executor, John Angelonides, to employ Henion as the attorney for the probate of that will.
 The gift or loan of the $31,000 to Couris and Angelonides is not without significance. Chresanthe testified that decedent said she "gave the money to erect a home for all of us" meaning "the family. Spiro [Sam], myself, Hareklea, Adamantia." Sam said there were no papers written or signed concerning it. The power of attorney in relation to decedent's bonds was executed in April, 1948. The bonds were cashed, or their proceeds became available to Couris, in May and June. Decedent turned over to Sam an additional bond for $5,000, apparently in July, 1948. When the bond redemption check came through, Sam presented it to decedent for her signature but she was too sick to sign. That was toward the last two or three days before she went to the hospital the second time. After she died, Sam turned that check over to the estate. It is inferable that $31,000 is not the measure of the amount by which Sam and John might have benefited *52 by gifts, or by loans payable out of income, had decedent's life, health and strength lasted longer than they did.
 Proponents direct attention to the lack of direct evidence that anyone exerted pressure upon the decedent which caused the execution of a will that did not represent her wishes. Contestant's case then depends, they say, upon Sam Couris (who occupied a confidential relationship toward decedent and was active in the preparation and execution of her will) unduly benefiting under the will, whereas he did not benefit at all, for he and his wife, beneficiaries under the first will, take nothing under the second. Proponents claim that in such a case the burden of going ahead with the proof did not shift to the proponents, that contestant did not make out a prima facie case.
 That argument overlooks some of the significant circumstances which were before the jury for their consideration. The coincidental gift or loan transaction, by which Sam Couris distinctly benefited, merited their consideration. Nor were they required to balance the second will solely against the first, to infer benefit or detriment to Couris. If, by the spring or summer of 1948, decedent had decided to make a new will, apportioning her estate among all of her next of kin, the disposition of the whole of it to the members of the Angelonides family might have appeared to Couris a feasible and advantageous alternative, thus keeping these properties within a close family circle and within the sphere of his influence. Or, he may have been motivated by a generous impulse toward his brother-in-law, friend, and partner, who looked to him for guidance and whose business affairs he managed, acting as the agent or representative of John Angelonides, who did directly and measurably benefit under the will which was prepared and executed with the aid of Couris. [7] It is not the law that the confidential adviser who has the opportunity to influence a testatrix, and aids her in the making of her will, must directly benefit as a devisee or legatee under that will, for the burden of going ahead to shift to the proponents of the will. [8] If the beneficiary is the spouse of the confidential adviser, the activity of the latter may be imputed to the former. (Estate of Trefren, 86 Cal.App.2d 139, 148 [194 P.2d 574], which in addition cites cases involving other relationships between the beneficiary and the confidential adviser which similarly operate; see, also, In re Daly's Estate, 59 S.D. 403 [240 N.W. 342]; Little v. Sugg, 243 Ala. 196 [8 So.2d 866, 867].) [9] If the confidential *53 adviser and active participant is the agent or representative of the beneficiary, the former's acts are those of the beneficiary.
 Proponents speak also of the evidentiary scope of the testator's oral declarations, that they bear only upon her state of mind, are not proof of the facts stated by her. [10] However, as the trial judge correctly observed in the opinion which he wrote and filed, "there was but one objection to the admission" of that testimony, "which objection came after the answer, and was not renewed" and "there was no request that such evidence be limited to a single purpose," concluding, "Incompetent evidence, if relevant and if not objected to, is sufficient ... and in relation to the motion for judgment notwithstanding the verdict, must be considered as any other relevant testimony."
 [11] Proponents further claim that contestant's testimony concerning his conversation with Chresanthe and her not wanting decedent to consult a certain attorney in relation to her will, was erroneously admitted over proponents' objection. The objection was solely upon the ground of hearsay, not appropriate to exclude evidence of an admission made by one of the proponents. There was no objection upon the ground that this was an admission by but one of the beneficiaries under the will, nor any motion or suggestion to limit the scope of the testimony to Chresanthe. Moreover, it would seem that evidence of Chresanthe's activities in guiding the decedent in the making of a will would be as admissible as the evidence of Sam Couris' activities, concerning admissibility of which proponents entertain no objection.
 [12] It was not for the trial court, nor is it for a reviewing court, to select, from the various inferences deducible from the circumstances in evidence, that inference or those inferences which should be drawn. That was the function of the jury. [13] The trial judge, after reciting most of the facts which we have narrated, and a few others, expressed the opinion that "So far as the motion for judgment notwithstanding the verdict is concerned, they [the facts which he had recited] must be accepted as true, in the light most favorable to contestant, and all inferences which may be drawn legitimately from them likewise must be indulged in favor of contestant, and conflicting evidence must be disregarded." Applying these principles, he correctly denied the motion for judgment notwithstanding the verdict.
 The order granting a new trial is affirmed. The appeals *54 from the judgment and the order denying the motion for judgment notwithstanding the verdict, are dismissed.
 Peters, P. J., and Bray, J., concurred.