[Civ. No. 2038. Fifth Dist. July 1, 1975.]

Estate of CARLO FRANCO, Deceased.
CATERINA ARMARIO, Contestant and Appellant, v.
JOHN LEROY FRANCO, as Executor, Objector and Respondent.

CATERINA ARMARIO, Plaintiff and Appellant, v.
JOHN FRANCO et al., Defendants and Appellants.

COUNSEL

Boccardo, Blum, Lull, Niland, Teerlink & Bell·and Richard D. Capparella for Contestant and Appellant and for Plaintiff and Appellant.

T.N. Petersen, Roland V. Howard and James R. Hardin for Objector and Respondent and for Defendants and Appellants.

OPINION

**GARGANO, Acting P. J.**—These appeals are concerned with a probate action contesting the last will and testament of Carlo Franco and a civil action seeking to set aside a transfer of stock and to have title in the stock restored to the plaintiff; both actions were instituted by the decedent's half sister, Caterina Armario. The defendant in the probate action was John Leroy Franco, the executor of decedent's estate and decedent's nephew. The defendants in the civil action were decedent's older brother, John Franco, John Franco's son, John Leroy Franco, individually and as executor of decedent's estate, and John Leroy Franco's wife, Reva Franco.

Because in each action the court granted a motion for judgment notwithstanding the verdict, we review the record and recite the facts after resolving all conflicts in favor of and giving the benefit of all reasonable inferences to the jury's verdicts. (*Quintal v. Laurel Grove Hospital,* 62 Cal.2d 154, 159 [41 Cal.Rptr. 577, 397 P.2d 161].)

The decedent was born in Genoa, Italy; he migrated to this country in his youth and died in Tuolumne County on May 30, 1970, at the age of 76. He was survived by his brother John, his sister Caterina and his sister Rosetta Vassello, who was living in Italy. A second brother, Joseph Franco, had died about two years earlier in Calistoga, California.

After settling in California, Carlo worked for many years as a farm hand on a ranch owned by Sal Ferretis near Groveland. Ferretis sold the ranch in the early 1940's, and following the sale gave Carlo a lump sum payment of $20,000; Carlo used the money to purchase American Telephone and Telegraph stock in·his name and in the name of Caterina as joint tenants. Later, he used the proceeds from the stock dividends to

purchase additional stock in his name and in the name of his sister as joint tenants.

In 1957, decedent was employed as a caretaker on land in Groveland owned by Frederick McRae; McRae built a small cabin on the land for Carlo to live in and thereafter treated him as a member of the family; during the years that followed, the McRaes spent almost every Thanksgiving Day in Groveland with their employee.

On May 28, 1968, Joseph Franco died intestate, leaving an estate valued at $40,000; John Franco was appointed administrator of the estate. In the meanwhile, Caterina Armario went to Calistoga and made funeral arrangements for her deceased brother. She also took care of some other matters that needed attention, expending some of her own money in the process. Then, when Caterina's son asked John Franco about presenting a claim in Joseph's estate for reimbursement for his mother, John told the son to "pad" the claim; John Franco and his sister Rosetta Vassello had been feuding over the distribution of an estate in Italy, and John told Caterina's son to double Caterina's expenses so the "son-of-a-bitch in Italy [would] get as little as possible." Later, John Franco showed the padded claim to Carlo and told his brother that Caterina was trying to cheat them out of their share of Joseph Franco's estate; Carlo became very angry over the incident.

In the spring of 1969, John Franco and Reva Franco, the wife of John Leroy, went to Groveland to visit Carlo; they visited him again in early October. Prior to those visits, John Franco and his family had not visited Carlo more than 5 times over a period of 20 years. In November, John, John Leroy and Reva went to Groveland, picked up Carlo and transported him to their hometown of Merced for the Thanksgiving holidays.

On November 29, 1969, John Franco and his wife, Mary C. Franco, took Carlo to John's attorney in Merced where Carlo executed his will; with the exception of a $300 gift to Caterina, the will bequeathed all of Carlo's estate to John Franco's two sons, John Leroy Franco and James Carlo Franco, to be divided equally between them; John Leroy was named executor of the estate.

On December 1, 1969, John Franco, Mary C. Franco, John Leroy Franco and Reva Franco took Carlo to a bank in Sonora where Carlo

had a safety deposit box; the names of the two women were added as owners of the box. From the bank, John Leroy Franco and Reva Franco transported Carlo to Caterina's residence in Soulsbyville. Carlo got out of the car and, in a very hurried manner, told his sister, "Come on Caterina, come on, I want you to sign, go sign." Believing that her brother wanted her to sign a dividend check, Caterina got into the vehicle, and the group proceeded to the bank in Sonora; at the bank Caterina signed the stock certificates, relinquishing to Carlo any interest she may have had in the American Telephone and Telegraph stock Carlo had purchased in his name and in her name as joint tenants.

In the middle of December 1969, Carlo mentioned to Frederick McRae that he was going to change his will. In April of the following year, Carlo told Mary D. Franco, a relative whom he visited almost daily, that he found out that his nephews just liked his money and did not like him; Carlo explained to Mary D. Franco that he had told this to his nephews and that Reva Franco then had called him names. He subsequently told Mary D. Franco that he desired to make a new will and that he wanted to provide for her mentally retarded son.

On May 10, 1970, Carlo died alone in his small cabin. Thereafter, his will was admitted to probate, and John Leroy Franco was appointed the executor of the estate.

On November 2, 1970, Caterina filed a petition for revocation of probate; the petition alleged that the will which was admitted to probate was obtained by undue influence and fraud. Later, Caterina filed an action to set aside the stock transfer and to have restored to her her alleged joint tenancy interest in the more than 1,000 shares of American Telephone and Telegraph stock which Carlo had purchased in his name and in her name as joint tenants; the complaint also was based on fraud and deceit and sought compensatory and punitive damages. By stipulation, the causes were consolidated for jury trial.

At the consolidated trial, it was established that Carlo Franco was illiterate; that he could write his name but he could not read or write English or his native Italian; that he had the mental maturity of a 14- to 16-year-old boy, was very naive in business matters and trusted anyone who was friendly with him; and that he was bashful, honest and very frugal.

It also was established that Caterina Armario was illiterate in the English language and almost illiterate in the Italian language and that she had no understanding of business affairs. There was testimony that she would sign anything that was put before her, that she could be influenced easily and that she and her brother Carlo trusted each other implicitly.

At the conclusion of the consolidated trial, the jury, in the probate action, returned a special verdict finding that Carlo Franco's will was obtained by undue influence but not by fraud; the court entered an order revoking the probate of decedent's will. In the civil action, the jury returned a general defense verdict and, in answer to a special interrogatory, stated that the decedent did not intend to make a gift of any part of his stock in American Telephone and Telegraph to his sister, Caterina; the court entered judgment in favor of defendants on all issues.

On February 22, 1972, the Francos, in the probate matter, made a motion for judgment notwithstanding the verdict in relation to the issue of undue influence. About one week later Caterina Armario made a similar motion in connection with the civil lawsuit as to the stock restoration issue. The motions were granted, and the court entered an order in the probate action refusing to revoke the probate of the will and entered a judgment in the civil action in favor of Caterina as to the issue concerning restoration of the stock and in favor of the Francos as to the issue involving the damages for fraud and deceit. Both sides have appealed, Caterina from the order entered in the probate action and the Francos from that part of the judgment entered in the civil action which was adverse to them.[1]

## THE CIVIL ACTION

There was substantial evidence to support the jury finding that Carlo Franco did not intend to give his sister a present interest in the valuable American Telephone and Telegraph stock he purchased in the early 1940's with his hard earned money. Carlo was a frugal person, and he had worked most of his life at menial labor as a ranch hand and caretaker. Furthermore, although he purchased the American Telephone and Telegraph stock in his name and in the name of Caterina, as joint tenants, he kept the stock in his own safety deposit box and apparently

---

[1]In the civil action, Caterina has not appealed from that part of the final judgment in favor of the Francos. However, she has perfected an appeal, in the nature of a cross-appeal, from the judgment originally entered on the jury verdict.

Caterina did not become fully aware of her purported proprietary interest in the stock until almost 10 years later when an error occurred in one of the stock dividends. Lastly, Carlo used the dividend checks to purchase additional stock without consulting Caterina; on occasions he "banked" the dividends for his own personal use; at different times he told his sister that the stock would be hers upon his death; and he told his brother John that he could change the joint ownership anytime he wanted to. ■ There can be no gift unless there is intent on the part of the donor to give a present interest. (*Turnbull* v. *Thomsen,* 171 Cal.App.2d 779, 784 [341 P.2d 69]; *De Puy* v. *Sullivan,* 168 Cal.App.2d 292, 295 [335 P.2d 750]; *Blonde* v. *Estate of Jenkins,* 131 Cal.App.2d 682, 685 [281 P.2d 14]; see, generally, *Jaffe* v. *Carroll,* 35 Cal.App.3d 53, 59 [110 Cal.Rptr. 435]; *Bank of America* v. *Cottrell,* 201 Cal.App.2d 361, 363 [20 Cal.Rptr. 126]; see also *Matson* v. *Jones,* 272 Cal.App.2d 826, 829 [77 Cal.Rptr. 717].)

■ In this case, the evidence strongly suggests that Carlo Franco intended to make a testamentary disposition of the American Telephone and Telegraph stock to his sister and that he put the stock in joint tenancy to facilitate the transfer of title after his death. (See *De Puy* v. *Sullivan, supra,* 168 Cal.App.2d 292, 295; see also *Romanchek* v. *Romanchek,* 248 Cal.App.2d 337, 341 [56 Cal.Rptr. 360].) ■ However, where, as here, the transaction does not qualify as a gift *causa mortis,* and where the donor intends the gift to take place after his death, the transaction is treated as a testamentary disposition and is invalid unless effected in conformity with the statutes regulating the execution of wills. (*Noble* v. *Garden,* 146 Cal. 225, 231 [79 P. 883]; *Bishop's School, etc.* v. *Wells,* 19 Cal.App.2d 141, 146 [65 P.2d 105]; *Estate of McEuen,* 18 Cal.App.2d 180, 181 [63 P.2d 332]; see 24 Cal.Jur.2d, Gifts, § 5, p. 9.)

■ Because there is substantial evidence to support the jury's finding on the special interrogatory, the court improperly set aside the jury's verdict in the civil action.[2]

---

[2]In her cross-appeal, Caterina attacks the form of the special interrogations submitted to the jury and the court's failure to give an instruction. Both contentions are unavailing since there is nothing in the record to show that she objected to the form of the interrogatories prior to their submission to the jury (see *Bate* v. *Marsteller,* 232 Cal.App.2d 605, 614 [43 Cal.Rptr. 149]) or specifically requested the instruction to be given. (*Starr* v. *Mooslin,* 14 Cal.App.3d 988, 1001 [92 Cal.Rptr. 583]; *Korakakis* v. *Freeman,* 178 Cal.App.2d 331, 335 [2 Cal.Rptr. 802].)

## THE WILL CONTEST

We turn to Caterina's appeal in the probate action; she contends that the court erred in granting the Francos' motion for judgment notwithstanding the verdict and thus holding as a matter of law that the will was not obtained by undue influence.

■ Undue influence consists of conduct which subjugates the will of the testator to the will of another and constrains the testator to make a disposition of his property contrary to and different from that he would have done had he been permitted to follow his own inclination or judgment *(Estate of Ricks,* 160 Cal. 467, 480 [117 P. 539]; *Estate of Wright,* 219 Cal.App.2d 164, 169 [33 Cal.Rptr. 5]; *Estate of Ventura,* 217 Cal.App.2d 50, 58 [31 Cal.Rptr. 490]).

■ Undue influence is established when it is shown that the testamentary disposition was brought about by undue pressure, argument, entreaty or other coercive acts that destroyed the testator's freedom of choice so that it fairly can be said that he was not a free agent when he made his will *(Estate of Welch,* 43 Cal.2d 173, 175 [272 P.2d 512]; *Estate of Anderson,* 185 Cal. 700, 707 [198 P. 407]); undue influence can be established by circumstantial evidence so long as the evidence raises more than a mere suspicion that undue influence was used; the circumstances proven must be inconsistent with the claim that the will was the spontaneous act of the testator. *(Estate of Welch, supra,* 43 Cal.2d 173, 178; *Estate of Anderson, supra,* 185 Cal. 700, 708-709.)

■ While the fact that a beneficiary enjoyed a confidential relationship with the testator or actively participated in procuring the will to be executed or that he unduly profited thereby are important circumstances to be considered, standing alone, none of these circumstances is sufficient to prove undue influence.

In *Estate of Lingenfelter,* 38 Cal.2d 571, 585 [241 P.2d 990], the California Supreme Court stated: "The indicia of undue influence have been stated as follows: '(1) The provisions of the will were unnatural. . . . (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; and (5) the chief beneficiaries under the will were active

in procuring the instrument to be executed.' (*Estate of Yale,* 214 Cal. 115, 122 [4 P.2d 153].) These, coupled with a confidential relationship between at least one of the chief beneficiaries and the testator, altogether were held 'sufficient to shift the burden to the proponents of the will to establish an absence of undue influence and coercion and to require the issues to be determined by the jury.' (*Estate of Yale, supra,* p. 123.)"

In the case at bench, there was sufficient evidence to support a jury finding that decedent's mental condition was such as to permit a subversion of his freedom of will; Carlo had the mental maturity of a 14- to 16-year-old boy, and there was testimony that he was bashful and trusted anyone who was friendly to him. (*Estate of Rutherford,* 153 Cal.App.2d 365, 371 [314 P.2d 475].) There was also sufficient evidence to support a jury finding that the testamentary dispositions of Carlo's will were at variance with his intentions expressed both before and after its execution; before Carlo made his will, he never expressed a desire to make one; at different times he told his sister that she would inherit all of his American Telephone and Telegraph stock if he predeceased her; after he made the will, he became disenchanted with his nephews and before his death expressed a desire to change the will.

Next, there was substantial evidence for the jury to find that the will was unnatural; decedent in 1969 suddenly left almost his entire estate to two nephews he had only seen on five or six occasions during his lifetime, even though he not only had an older brother, two sisters and other nieces and nephews living, but for many years had been in rapport with his sister Caterina, and had been visiting another relative almost daily. Clearly, a will in which the decedent has left his entire estate to two nephews he had hardly known and seldom seen, to the exclusion of a sister with whom he had had a long, close relationship and other close relatives, is unnatural; and while the decedent's action in the instant case may have been explainable, the evidence on this point was conflicting; it was up to the jury to resolve the conflict. (See *In re Carpenter,* 79 Cal. 382, 387 [21 P. 835]; *Estate of Welch,* 6 Cal.App. 44, 52 [91 P. 336]; 53 Cal.Jur.2d, Wills, § 53, p. 283.)

The question narrows to whether the third and fifth factors mentioned in *Estate of Lingenfelter, supra,* 38 Cal.2d 571, 585, are present in this case. More specifically, the crucial question is whether John Leroy Franco, a chief beneficiary in decedent's will, had the opportunity to control his uncle's testamentary act and, if so, whether he actually participated in the preparation and execution of the will.

We have concluded that the circumstantial evidence allows for the inference that John Franco schemed to have his brother Carlo leave the bulk of his estate to John's two sons and that John Leroy Franco and his wife Reva were aware of the scheme and actively participated in its execution. In other words, we believe that the circumstantial evidence, when viewed as a whole, shows that at the very minimum the Francos from Merced not only induced Carlo to make his will but that it was John, John Leroy and Reva who must have suggested its provisions. (*Estate of Fritschi,* 60 Cal.2d 367, 375-376 [33 Cal.Rptr. 264, 384 P.2d 656].)

In 1968, after John became the administrator of Joseph Franco's estate, he deliberately set out to win his younger brother's confidence and to destroy the rapport which had existed between Carlo and Caterina over the years; there was testimony that he induced Caterina's son to exaggerate his mother's claim against Joseph's estate and showed the exaggerated claim to Carlo with the suggestion that Caterina was trying to cheat him. Then, after John succeeded in driving a wedge between Carlo and Caterina, John and his son's wife Reva commenced to shower decedent with unaccustomed attention. John and Reva visited Carlo at Groveland in the spring of 1969, and again in early October of that year; prior to those visits, Carlo had not seen his Merced relatives on more than 5 occasions over a period of 20 years.

In November 1969, John, John Leroy and Reva apparently persuaded Carlo to spend the Thanksgiving holidays with John's family in Merced; the trio traveled to Groveland and brought Carlo back to Merced in the family car. Up to that time, Carlo had been spending each Thanksgiving with the McRaes, and it is significant that before leaving for Merced Carlo did not even tell the McRaes that he would not be with them that year. It is also significant that it was during the period Carlo was visiting the Franco family in Merced that he was taken by John to John's own lawyer, where Carlo executed his will, and that prior to that time Carlo never had expressed the desire to make a will; later, he made statements to the effect that his nephews were after his money and that when he told them so Reva called him names.

About a week after the will was executed, John Franco and his wife Mary, and John Leroy Franco and Reva Franco, took Carlo to the bank in Sonora where Carlo had a safety deposit box; the names of the women were added as owners of the box. From the bank, John Leroy and Reva

transported Carlo to the residence of Caterina, and then the couple transported Caterina and Carlo back to the bank in Sonora; at the bank, Caterina signed back to Carlo her purported joint interest in the American Telephone and Telegraph stock; this stock was the only valuable asset in Carlo's estate.

■ In summary, the evidence presented by Caterina in this case raises more than a mere suspicion that Carlo Franco's will was the product of undue influence. It paints a vivid picture of connivance, scheming and the application of undue pressure on the part of clever relatives which culminated in their becoming the objects of a not so clever testator's bounty. The picture first depicts Carlo as a hardworking, illiterate, mentally immature, gullible recluse who for more than 20 years enjoyed mainly the companionship of a sister and another close relative. The scene then shifts to Carlo's older brother John and his family who have arrived suddenly through a fortuitous circumstance, the death of another brother. In a short time, a wedge is driven between the younger brother and his sister. Afterward, the younger brother is showered with unaccustomed attention; he is even invited, apparently for the first time, to spend the Thanksgiving holidays in Merced in the home of his older brother. The scene again shifts, this time to the office of John's lawyer where Carlo has been taken by his brother; it is here where Carlo signs a will which not only contradicts his previous expressions but is wholly unnatural in its provisions. In less than a week, the names of two members of the Merced family are added as owners of Carlo's safety deposit box, and Carlo's sister's name is removed from the estate's most valuable asset. The epilogue is simple; once again alone, Carlo dies in his cabin.

The Francos argue that Caterina cannot prevail in this action because there was no showing of a confidential relationship between the testator and his nephews. They apparently assume that a confidential relationship between the testator and a chief beneficiary is also an essential ingredient to the establishment of a prima facie case of undue influence under the rationale of *Estate of Lingenfelter, supra,* 38 Cal.2d 571, 585.

■ A confidential relationship between the testator and beneficiary is not an essential factor in the indicia of undue influence mentioned in the *Lingenfelter* opinion (see *Estate of Darilek,* 151 Cal.App.2d 322, 330-332 [311 P.2d 615]); all that is required once the other factors enumerated in the opinion are present is circumstantial evidence giving rise to the inference that the relationship existing between the chief beneficiary and

decedent offered the former the opportunity to control the testamentary act and that the chief beneficiary was active in procuring the instrument to be executed, at least in the sense that he discussed the terms of the will with the testator and suggested some of its provisions. (*Estate of Fritschi, supra,* 60 Cal.2d 367, 375-376; see *Estate of Jamison,* 41 Cal.2d 1, 8 [256 P.2d 984].) However, even if a confidential relationship were required, the confidential relationship was supplied by John Franco. John was Carlo's older brother and the executor of an estate in which Carlo had a substantial interest. In addition, John knew or must have known that his brother was illiterate, gullible and a person of the mentality of a 14- to 16-year-old boy; also, John had won the decedent's confidence by proving to decedent that Caterina had made a false claim in Joseph Franco's estate. In short, John Leroy Franco not only had the opportunity to control his uncle's testamentary act through his father, but he actively participated in his father's activities in this regard. It is clear that the activities of the father were imputable to his son. (*Estate of Ventura, supra,* 217 Cal.App.2d 50, 59 [31 Cal.Rptr. 490]; *Estate of Lekos,* 109 Cal.App.2d 42, 52 [240 P.2d 387]; *Estate of Trefren,* 86 Cal.App.2d 139, 148 [194 P.2d 574].)

The order of the Tuolumne County Superior Court in probate action number A-3748, entered subsequent to the granting of the motion for judgment notwithstanding the verdict, which refused to revoke the probate of the will, is reversed. The judgment of the Tuolumne County Superior Court in civil action number 12813, entered subsequent to the granting of the motion for judgment notwithstanding the verdict is reversed; the judgment entered pursuant to the jury verdict is affirmed. The parties to bear their own costs on appeal.

Franson, J., and Thompson, J.,* concurred.

Petitions for a rehearing were denied on July 31, 1975, the opinion was modified to read as printed above, and the following opinion was then rendered:

**GARGANO, Acting P. J.**—Both sides have petitioned for a rehearing; in their petitions each side has alleged that we have misstated the facts. Caterina alleges that we incorrectly stated that Carlo Franco did not consult with her regarding the investment of proceeds derived from the stock dividends. The Francos assert that Caterina was Carlo Franco's half sister, not his sister, as is stated in the opinion.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

The Francos are correct in asserting that Caterina was Carlo's half sister and not his full sister. However, we have searched the record, and while the testimony of Caterina's daughter suggests that Carlo and her mother did "converse" about the stock dividends, the daughter also stated that ". . . he would tell her that he was going to get more stock [a]nd this is all she would know." Caterina's son testified that as far as he knew his mother just signed the dividend checks and Carlo kept the proceeds. The jury was not compelled, as a matter of law, to find that Caterina actively participated in the decision making process as to how the proceeds of the dividend checks were to be used.

In any event, we have reviewed the opinion carefully and are satisfied that any misconception we may have had as to some of the facts was not a significant factor in the decision.

Caterina also objects to our statement that the record does not show that she objected to the form of the interrogatories submitted to the jury or requested a crucial instruction she claims was not given. All the record shows is that in her points and authorities submitted in support of her motion for a new trial Caterina alleged that the interrogatories were confusing and that she had requested the instruction in question; there is nothing in the record to show that Caterina objected to the interrogatories before the case was submitted to the jury; nor does the record show, affirmatively, that the instruction in question was proffered by Caterina and refused by the court.

We note that in the petitions for rehearing each side has recited the evidence most favorable to that side's position. For example, Caterina maintains that there is evidence in the record to show that she was fully aware that she had a joint tenancy interest in the stock on, or soon after, the initial purchase. This ignores Caterina's own daughter's testimony that her mother did not even know her name was on the stock until after the wrong name appeared on one of the dividend checks 10 years or so after the initial purchase. The Francos point out that John Franco testified that Carlo came to Merced for the Thanksgiving holidays at his own request; however, the reasonable inference drawn from the testimony of other witnesses is to the contrary.

As previously stated, in reviewing the granting of a motion for judgment notwithstanding the verdict the function of the appellate court is to review the record by resolving all conflicts in favor of and giving the benefit of all reasonable inferences to the jury's verdict. (*Quintal* v.

*Laurel Grove Hospital,* 62 Cal.2d 154, 159 [41 Cal.Rptr. 577, 397 P.2d 161].)

Franson, J., and Thompson, J.,* concurred.

The petitions of all the parties for a hearing by the Supreme Court were denied August 28, 1975.

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.