Filed 9/20/16  Estate of Shartsis CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| Estate of JULIUS LEON SHARTSIS, Deceased. | D069658 |
| DAVID HO, | |
| Petitioner and Appellant, | (Super. Ct. No. PROPS1100741) |
| v. | |
| LINDA LEE SHARTSIS BRONKEN et al., | |
| Contestants and Appellants. | |


APPEAL from orders of the Superior Court of San Bernardino, Tara Reilly, Judge. Order granting contest and denying petition to probate reversed; order granting summary adjudication affirmed.


DeCastro, West, Chodorow, Mendler, Glickfeld & Nass, Inc., Jerry L. Kay and Joseph Klapach for Petitioner and Appellant.

Law Office of Gary C. Wunderlin and Gary C. Wunderlin for Contestants and Appellants.

In this opinion, we consider an appeal and cross-appeal from orders of the probate court arising from proceedings regarding the estate of Julius Leon Shartsis. In the appeal, a beneficiary of Shartsis's will, David Ho, challenges the trial court's order granting the contest filed by Shartsis's children Linda Lee Shartsis Bronken (Linda) and Gary Lee Shartsis (Gary) on the basis that Shartsis was suffering from a delusion when he executed his will.[1] In the cross-appeal, Gary and Linda challenge the probate court's order granting summary adjudication in favor of Ho on their causes of action alleging that Ho exercised undue influence over Shartsis and committed fraud in causing Shartsis to make his will.

We conclude that as to Ho's appeal from the order granting Gary and Linda's contest, the trial court's finding that Shartsis suffered from a delusion of the type required to establish lack of capacity is not supported by substantial evidence. As to Gary and Linda's cross-appeal from the summary adjudication on the undue influence and fraud causes of action, we conclude that the trial court properly granted summary adjudication. Accordingly, we reverse the order granting Gary and Linda's contest, and we affirm the order granting summary adjudication in favor of Ho.

---

[1] For the sake of clarity, we refer to Shartsis's children by their first names, and we intend no disrespect by doing so.

I

FACTUAL AND PROCEDURAL BACKGROUND FOR HO'S APPEAL

As we have explained, the matter before us concerns both (1) Ho's appeal from the trial court's decision granting Gary and Linda's will contest, and (2) Linda and Gary's cross-appeal of the trial court's ruling granting summary adjudication on the undue influence and fraud causes of action. We will first discuss and resolve Ho's appeal.

A.      *Shartsis's Family Relationships*

Shartsis, who committed suicide on September 29, 2011, at age 79, had three children: Gary and Linda, and their brother Dale Lee Shartsis. Shartsis kept in contact with Gary and Linda over the years, but had no contact with Dale for the last 25 or 30 years of his life.

Shartsis was divorced from the children's mother around the late 1960's, when Linda was approximately age 10 and Gary was approximately age eight. After the divorce, Gary and Linda saw Shartsis for daytime visits on a regular basis while they were growing up. Shartsis lived in the greater Los Angeles area until 1988, when he moved to Victorville.

Linda moved to the Lake Tahoe area in 1977, and thereafter visited with Shartsis about once a year. She also kept in contact with Shartsis by telephone, e-mail and holiday cards. Shartsis did not attend Linda's wedding, although he was invited, and sometimes would visit the Lake Tahoe area without seeing Linda or telling her he was there. According to Linda's description, she viewed Shartsis as a frugal, self-centered, difficult and eccentric person, who would cut off communication with people for petty

3

reasons. Nevertheless, Linda stated that she had a loving relationship with her father and felt close to him.[2] As Shartsis aged and developed medical problems, Shartsis did not keep Linda informed about the details of his surgeries and hospitalizations, which Linda found out about only after the fact.

Gary continued to live in the Los Angeles area, and would generally see Shartsis every month or two after Shartsis moved to Victorville. Gary would also speak with Shartsis on the telephone and keep in contact with him by e-mail and holiday cards. As did Linda, Gary described Shartsis as frugal, self-centered, difficult and eccentric. As Gary explained, Shartsis cut off contact with him several times. For example, in 2006 or 2007 Shartsis cut off contact because he disagreed with how much ice Gary put in a drink at Burger King. Shartsis also cut off contact with Gary more than once because Gary supplemented the small tips that Shartsis left at restaurants. Finally, Shartsis also became distant and cut off contact after Gary informed Shartsis that he had been diagnosed with cancer around 2009. Gary felt that Shartsis believed that Gary was blaming him for passing on genes that predisposed him to cancer and also acted like he could "catch"

---

[2] Although Linda described a close relationship with Shartsis, it is evident that Shartis was distancing himself from Linda shortly after the 2009 Will was executed. In an e-mail that Linda wrote to a relative in January 2010, she stated, "I have tried to talk to and write to Dad. He just writes short e-mails back and never responds when I want to stop by and visit."

cancer from Gary.[3]  Despite these difficulties, Gary believed that he and his father loved each other and had a close relationship.

On several occasions, Shartsis told medical personnel that he had no next of kin or that he had not seen his children in many years.  However, Shartsis spoke with his friends and neighbors about Gary and Linda and his visits with them, and he seemed to be proud of them.

B.    *Shartsis's Relationship with Ho and Pacific BMW*

Before he moved to Victorville in 1988, Shartsis owned an auto repair shop and a used car lot on Brand Boulevard in Glendale, and he lived in an apartment on the property (the Brand Property).  Next door to the Brand Property was the Pacific BMW auto dealership that Ho opened in 1982.  Ho has a Masters of Business Administration from the University of Southern California and previously worked in corporate banking.

---

[3]    E-mails in March 2010 from Gary to Shartsis show that Shartsis had cut off communication with Gary around that time.  First, on March 2, 2010, Gary wrote to Shartsis about an upcoming cancer surgery, stating, "I know how you feel about me but I wanted you to know before you heard it from some one [*sic*] else. . . .  I am sorry I have not been able to talk to you but it is OK.  It was like this for many years and you obviously have your reasons.  I am not perfect."  Then, on March 16, 2010, Gary wrote to Shartsis, "I don't know what I did to you.  I called you a couple times and you said you were busy. . . .  This is not a game for me.  I just e[-]mailed you so you would know about the cancer and my life from me and not a stranger.  I am sorry for what ever [*sic*] I did.  I know that to be forgiven you have to understand how to forgive and I am trying very hard."  An e-mail in February 2011 from Gary to Steve Lindstrom shows that Shartsis had cut off contact with Gary around that time period:  "My dad has responded to my letters with his jokes and chain e[-]mails with no reply to any of my correspondences.  He may not know about my cancer or surgeries. . . .  Dad was upset when his neighbors contacted me following his knee and back issues awhile back."

Ho and Shartsis met in 1982, and as business neighbors, they spoke to each other a few times a week, exchanging pleasantries and discussing cars and business. Ho and Shartsis did not socialize with each other outside of their acquaintance at their places of business. After Shartsis moved to Victorville, Ho saw Shartsis about once a year when Shartsis came to the Pacific BMW dealership, but he did not otherwise socialize with Shartsis.

In 1985, Ho and Shartsis entered into a lease agreement, under which Ho, on behalf of Pacific BMW, leased from Shartsis a portion of the Brand Property that Shartsis was no longer using, consisting of service bays and parking spaces. When Shartsis closed his business and moved to Victorville, the scope of the lease was expanded to include all of the Brand Property.

Sometime around 1995, Ho and Shartsis agreed that in lieu of yearly adjustments of the lease payment based on the consumer price index, Ho would pay for Shartsis to lease a new BMW, to Shartsis's specifications, every two or three years. By all accounts, Shartsis was very proud of his leased BMW, and witnesses testified that Shartsis would talk at length to them about his car and would insist on showing off its features to them.

In approximately 2002, Ho decided to build a new building at Pacific BMW that would be partially located on the Brand Property. Ho asked Shartsis if he would sell the Brand Property to him, but Shartsis declined, explaining that he preferred the regular income from a lease and he did not want to pay income tax on his profits from a real estate sale. In October 2002, Ho's limited liability company and Shartis entered into a ground lease for the Brand Property with a term of 99 years. The ground lease provided

6

for a monthly lease payment to Shartsis of $7,500 per month, personally guaranteed by Ho, and it further stated that, consistent with the terms of Shartsis's last will and testament, the Brand Property would pass to Ho, provided Ho was the majority owner of the tenant of the property. In connection with the ground lease, Shartsis continued to receive a leased BMW free of charge.

In 2006, as Ho testified, Shartsis had $850,000 that had been held in a certificate of deposit at the bank, but Shartsis wanted to invest the funds at a higher interest rate than the bank would provide. According to Ho, Shartsis approached him about the idea of making a loan of $850,000 to Pacific BMW at a higher interest rate than the bank would provide to Shartsis. Ho agreed, and in 2006, Shartsis made an unsecured loan to Ho in the amount of $850,000. In 2008, Shartsis requested that Ho increase the amount of the loan to $1 million, as he had an additional $150,000 in the bank that he wanted to invest. On a yearly basis until Shartsis's death, Ho and Shartsis renewed the $1 million loan, with appropriate changes in the interest rate.

Numerous witnesses testified that Shartsis constantly boasted about his relationship with Pacific BMW. Shartsis would sometimes refer to himself as a "partner" in the dealership, but at other times he would more specifically and accurately describe the fact that he was leasing land to Pacific BMW and that he loaned it money. Shartsis carried around a copy of the $1 million note to Pacific BMW in his wallet and showed it to people to impress them, and he would show his neighbors proof that he was receiving lease payments from Pacific BMW.

7

Steven Lindstrom was the general manager at Pacific BMW and met Shartsis around 1987. Before Shartsis moved to Victorville, Lindstrom and Shartsis were acquaintances who exchanged pleasantries. After that, Lindstrom communicated with Shartsis because he was in charge of obtaining the leased BMW for Shartsis. In that capacity, Lindstrom communicated with Shartsis by phone and e-mail and saw Shartsis when he came into the dealership about once a year, sometimes having lunch with him.

C.     *Testamentary Documents*

1.     *The 2009 Will*

The operative testamentary document at the time of Shartsis's death was a will that Shartsis executed on April 28, 2009 (the 2009 Will), naming Ho as executor. The 2009 Will made the following bequests: (1) all of Shartsis's property to Ho, whom the 2009 Will describes as a "friend"; (2) 90 percent of any residue to Ho; and (3) 10 percent of any residue to Lindstrom, also described as a "friend." The 2009 Will identified Shartsis's three children but made no bequest to them. The 2009 Will was drafted by attorney Carolyn Schauf-McCarter (Schauf) based on handwritten notes that Shartsis gave to her when she met with Shartsis in person and discussed his estate planning.

Evidence in the record sheds light on Shartsis's reasons for not including his children in the 2009 Will. Shartsis wrote to Ho in April 2009 explaining the 2009 Will. He stated, "All the children are excluded to make sure that you will not have a problem handling the will. They are not honest and are my friends only for what they can get when I die. Gary is also excluded from the will for reasons that he has done to me personally [*sic*]. There is none of my children in the will." Similarly, in an April 2009

telephone conversation between Ho and Shartsis about the 2009 Will, Shartsis told Ho he "just didn't trust his kids." On an unspecified date, Shartsis told a friend that "he wasn't really happy with his children so they were getting cut out of the will."

Also of relevance to Shartsis's view of Gary's and Linda's character and their relationship with him, Shartsis told a friend within the last seven or eight years of his life that "his kids loved him only for the money." In addition, both Lindstrom and Ho testified about Shartsis's negative reaction to his children's dispute over their mother's estate in the late 2000's.[4] Lindstrom testified that when Shartsis's ex-wife died Shartsis "called me and told me that she died and that his kids were being like vultures." Ho testified that Shartsis told him that after Shartsis's ex-wife died, "he was upset . . . the kids were fighting over the mom's estate."[5]

2. *Prior Wills*

Prior to the 2009 Will, Shartsis made several wills, some of which were admitted at trial.[6]

In October 1986, Shartsis executed a will (the 1986 Will) that gave (1) one dollar to each of his three children; (2) all of his tangible personal property to his siblings;

---

[4]    Based on an e-mail contained in the record, it appears that Shartsis's ex-wife died in January 2006.

[5]    Two e-mails in the appellate record appear to be communications between Gary and Shartsis in January 2007 and March 2007 discussing the siblings' dispute over their mother's estate.

[6]    As we will discuss, Shartsis's 1974 will was not admitted into evidence at trial.

9

(3) 60 percent of his residual estate to his siblings; (4) 35 percent of his residual estate to Ho, in addition to giving Ho the right to purchase the Brand Property at fair market value; and (5) 5 percent of his residual estate to a friend.

In February 1996, Shartsis executed a will (the 1996 Will) that gave (1) all of his tangible personal property to his three children; (2) 60 percent of the residual estate to his three children, in equal shares; and (3) 40 percent of the residual estate to Ho, in addition to giving Ho the right to purchase the Brand Property at fair market value. Ho was named as executor of the will.

In July 2001, Shartsis executed a will (the 2001 Will) that gave (1) all of his tangible personal property to his three children in equal shares; (2) the Brand Property to Ho; (3) 15 percent of the residual estate to the three children in equal shares; and (4) 85 percent of the residual estate to Ho. The bequest of the Brand Property and 85 percent of the residual estate to Ho were made on the condition that Ho or "a corporation in which he is a majority shareholder" is leasing and in possession of the Brand Property at the time of Shartsis's death. Ho was once again named as executor of the will.

In October 2002, Shartsis executed a will (the 2002 Will) that was identical to the 2001 Will, except that the language regarding the conditions for Ho receiving the Brand Property and 85 percent of the residual estate were changed to broaden the type of legal entity that could be leasing and possessing the Brand Property in association with Ho at the time of Shartsis's death. Specifically, the reference to Ho or "a corporation in which he is a majority shareholder" in the 2001 Will was amended to provide that "at the time of my death . . . [Ho], or a corporation, limited liability company, partnership or other

10

form of entity in which [Ho] owns a majority interest, is then leasing said property from me, and said property is in the possession of an entity in which [Ho] owns a majority interest."

D.      *Proceedings in the Probate Court*

After Shartsis died on September 29, 2011, Ho filed a petition to probate the 2009 Will on October 20, 2011 (the Petition).  Linda and Gary filed a contest and opposition to probate of the 2009 Will on November 21, 2011 (the Contest).  The Contest alleged that probate of the 2009 Will should be denied because (1) Shartsis was not of sound mind and therefore lacked capacity at the time he executed the 2009 Will; (2) the 2009 Will was made as a direct result of Ho's undue influence on Shartsis; and (3) the 2009 Will was procured by Ho's fraud.

The trial court granted summary adjudication in favor of Ho on the undue influence and fraud causes of action.  That ruling is the subject of Gary and Linda's cross-appeal, which we discuss in section III.

The matter proceeded to a bench trial on the remaining cause of action alleging that Shartsis lacked capacity when he executed the 2009 Will.  Gary and Linda's theories at trial were that at the time of executing the 2009 Will Shartsis was suffering from two delusions:  (1) that he was a partner in Pacific BMW, and that his partner Ho was a dear friend; and (2) that he did not have a relationship with his children.

Regarding Shartsis's delusion as to his relationship with his children, Gary and Linda's expert witness, David W. Trader, offered two central opinions.  First, he testified that the statements that Shartsis made to medical providers about having no next of kin or

11

being estranged from his family established that Shartsis was suffering from the delusion that he had no children or no relationship with them. However, during his testimony, Trader also offered a *second* view as to the type of delusion that Shartsis held concerning his children, which took into account the fact that Shartsis seemed to realize in his everyday life that he had children and that he had an ongoing relationship with them. As Trader explained, Shartsis's delusion was that "essentially he had no relationship in the sense that no *good* relationship with his children [*sic*] or he *minimized* that relationship with his children." (Italics added.)

In a lengthy oral ruling occurring one week after the end of the trial, the trial court rejected the first claim of delusion, concluding that there was some basis in fact for Shartsis to have believed that he was a partner in Pacific BMW with his friend Ho, in that he leased land to the dealership and made a $1 million loan to it. However, as to the second claim of delusion, the trial court found that Shartsis was suffering from a delusion regarding his relationship with Gary and Linda at the time he executed the 2009 Will.

The trial court rejected the proposition that Shartsis's statements to medical providers that he had no next of kin or had not seen his children in many years was evidence that Shartsis was under a delusion that he had no children or was estranged from his children. The trial court found: "I think the reason that he told people that he was estranged or hadn't had contact with his family when he was in the hospital, he didn't want you to call, he didn't want you to know."

The trial court did however find that Shartsis was suffering from the second type of delusion described by Trader concerning his children, namely a delusion as to the

12

*quality* of his relationship with his children and their motivation for maintaining contact with him. Specifically, the trial court explained, "I'm going to find that [Shartsis] did not have the testamentary capacity to execute the 2009 [W]ill, but for his delusional beliefs that he had no relationship with his children, that his children were the vultures and money hungry children that he would say they were, but for those beliefs I do not believe that he would have executed that particular will." Reviewing the evidence, the trial court described the ongoing contact Shartsis had with Gary and Linda, and explained, "There is absolutely no evidence that you were vultures. I have no evidence in front of me that you attempted to act in any kind of, Gee, Dad, I could use a few bucks, trying to access any of his bank accounts. . . . Nothing to suggest there is any evidence anywhere at all that all you were after was his money, that you were vultures, that you didn't love him, that you didn't like him, that the only reason you drove all those hours . . . to visit for a few hours . . . was because you were hoping for a few bucks when he died. All the evidence I have is quite to the contrary. . . . You've spent years convincing yourself that you have this loving relationship with your father. That is the evidence I've got."

The trial court formally entered an order granting the Contest and denying Ho's Petition on June 6, 2014. Ho filed a notice of appeal.

13

## II.

## LEGAL ANALYSIS OF HO'S APPEAL

A.   *Ho's Argument That the Trial Court Erred in Failing to Issue a Statement of Decision Lacks Merit*

We first consider Ho's contention that the trial court erred in failing to issue a statement of decision.

Code of Civil Procedure section 632 states that although a trial court is not required to issue written findings of fact and conclusions of law following a bench trial, for trials lasting more than one day a party may request a written statement of decision within 10 days of the court announcing its decision. (*Ibid.*) The statement of decision "shall be in writing, unless the parties appearing at trial agree otherwise." (*Ibid.*)[7] Ho filed a timely request for a written statement of decision on October 10, 2013, less than 10 days after the trial court issued its oral decision granting the Contest on October 2, 2013.

After Ho's request for a written statement of decision, the trial court indicated in a November 7, 2013 order that it "finds good cause to issue its Statement of Decision no later than December 27, 2013." However, at an April 23, 2014 hearing, the trial court indicated that it had not yet issued a statement of decision. The trial court explained that it "completely misunderstood" and "terribly screwed up," as it erroneously believed that

---

[7]   Further, the California Rules of Court provides that the trial court shall prepare and serve a proposed statement of decision within 30 days of the request, but for good cause the trial court may extend that deadline. (*Id.*, rule 3.1590(f), (m).)

the parties wanted to wait until a private mediation process was finished before receiving the statement of decision. During the April 23, 2014 hearing, the trial court stated that it was prepared to "finish . . . up" the statement of decision "very quickly" if Ho still wanted to receive it.

Counsel for Ho indicated that he was no longer requesting the statement of decision, explaining, "Well, it seems to me that the statement of decision is kind of that ship [that] left the station." Counsel continued, "And I think that the law provides that [if] there is no statement of decision, that your oral -- ." The trial court finished counsel's thought, "The oral statement becomes the statement." Counsel replied, "I think so." Opposing counsel then expressed his view, explaining "I don't have any problem with that. I just want to make sure there is no assertion of error later on." Counsel for Ho did not respond to or dispute opposing counsel's statement. No further discussion was held on the issue, and the trial court did not issue a statement of decision before it entered a formal order granting the Contest and denying the Petition.

Ho contends on appeal that "[t]he judgment in this case is subject to automatic reversal because the trial court failed to issue a statement of decision upon Mr. Ho's timely request."[8] We reject the argument because the discussion quoted above shows that Ho *withdrew* his request for a written statement of decision. Specifically, although

_____

[8]     As the parties acknowledge, our Supreme Court currently has before it the issue of whether a trial court's failure to render a statement of decision after a timely party request is reversible per se, with no inquiry into prejudice. (*F. P. v. Monier*, review granted Apr. 16, 2014, S216566.) As we conclude that the request for a statement of decision was withdrawn, the issue pending before our Supreme Court is not relevant here.

15

the trial court clearly communicated that it was prepared to issue a statement of decision, counsel for Ho indicated at the April 23, 2014 hearing that he no longer wanted to receive a written statement of decision. Instead, he stated that he would allow the trial court's oral pronouncement to function as the statement of decision. Opposing counsel stated that he had no problem with that approach.

"A party may waive his or her right to a written statement of decision. [Code of Civil Procedure s]ection 632 provides that '[t]he statement of decision shall be in writing, *unless the parties appearing at trial agree otherwise*.' (Italics added.)" (*Whittington v. McKinney* (1991) 234 Cal.App.3d 123, 129-130.) The parties here waived the right to a statement of decision at the April 23, 2014 hearing by agreeing that the trial court's oral ruling would serve as the statement of decision.

Further, any error by the trial court by failing to issue a statement of decision was *invited* by Ho, because Ho declined the trial court's offer to issue a written statement of decision at the April 23, 2014 hearing. Ho may not rely on an invited error as the basis for a reversal on appeal. (*Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1555 [under the doctrine of invited error, "[w]here a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal"]; see also *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [explaining invited error doctrine].)

16

B.  *Ho Has Not Established That the Trial Court Abused Its Discretion in Excluding Certain Evidence Regarding Shartsis's Prior Wills*

We next consider Ho's argument that the trial court erred in excluding two items of evidence during trial.  The first item was a will that Shartsis executed in 1974 that left his entire estate to a friend rather than to his children (the 1974 Will), and which was identified at trial as exhibit 183.  The second item was a videotape prepared contemporaneously with Shartsis's execution of his 2002 Will (the 2002 Video), in which he explained why he was leaving each of his children only five percent of the residue of his estate, detailing the extent of his contact with his children and stating that "all my children aren't very close to me at all."

Regarding the 1974 Will, Ho's appellate argument that the trial court erred in excluding that item is without merit because Ho points to nothing in the record showing that the trial court made a ruling excluding that document.  Indeed, according to our review of the record, the only two times that exhibit 183 (i.e., the 1974 Will) was mentioned during trial was (1) when exhibit 183 was identified during the testimony of Trader, who stated that he had considered it in formulating his expert opinion; and (2) when, at the end of trial, the parties identified exhibit 183 as one of the documents that they were stipulating would *not* come into evidence.  We accordingly reject Ho's argument that the trial court erred as to the 1974 Will.

Turning to the 2002 Video, that evidence was the subject of a motion in limine by Gary and Linda to exclude it at trial.  While considering motions in limine prior to trial, the trial court tentatively ruled that it would exclude the 2002 Video because the issue of

17

Shartsis's capacity to make the 2002 Will was not at issue. However, the trial court qualified its ruling by stating that if Gary and Linda's expert witness Trader testified at trial that he relied on the 2002 Video in reaching his expert opinion, it would revisit the issue.

During trial, Trader testified that he reviewed the 2002 Video as part of his analysis, although he qualified that statement by explaining that at the time of his analysis, his assignment was to examine Shartsis's capacity to make both the 2002 Will *and* the 2009 Will. After that testimony, the trial court revisited its tentative ruling on the motion in limine and decided to affirm it by excluding the 2002 Video. As the trial court explained, although the 2002 Video may be "relevant to some extent" it was not sufficiently relevant to warrant the time required to view the video. The trial court observed that the validity of the 2002 Will was not an issue presented at trial. Further, to the extent that the terms of Shartsis's 2002 Will were relevant to deciding whether Shartsis lacked capacity to make the 2009 Will, the trial court observed that it already had the 2002 Will before it.[9]

We apply an abuse of discretion standard when reviewing the trial court's ruling excluding the evidence of the 2002 Video. (*People v. Fuiava* (2012) 53 Cal.4th 622, 663.)

As the trial court's ruling excluding the 2002 Video was based primarily on its view that it would consume too much time to view the video, which was not warranted in

_____

[9]     The 2002 Will was admitted into evidence.

18

light of its minimal relevance, the trial court appears to have relied on Evidence Code section 352.  Under that provision, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) *necessitate undue consumption of time* or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (*Ibid.*, italics added.)

Here, in conducting the weighing required by Evidence Code section 352, the trial court was well within its discretion to conclude that the 2002 Video had only slight probative value because its main purpose was to establish Shartsis's capacity to make the 2002 Will, which was not an issue at trial.  Weighing this minimal relevance against the consumption of time that would be entailed in locating a device to play the video and to watch it, the trial court could reasonably decide that the 2002 Video should be excluded under Evidence Code section 352.

C.    *The Finding That Shartsis Suffered from a Delusion About His Children Sufficient to Incapacitate Him from Executing the 2009 Will Is Not Supported by Substantial Evidence*

The final issue in Ho's appeal is whether sufficient evidence supports the trial court's decision that Shartsis suffered from an incapacitating delusion within the meaning of the Probate Code.

1.    *Burden of Proof and Standard of Review*

"Competency to make a will is presumed. . . .  The burden is on the contestant to prove that at the very time of the execution of the will testat[or] was incompetent." (*Estate of Goetz* (1967) 253 Cal.App.2d 107, 112-113, citations omitted.)  As the parties contesting the validity of the 2009 Will, Gary and Linda "had the burden of proving

19

[Shartsis] was delusional at the time of executing the will." (*Goodman v. Zimmerman* (1994) 25 Cal.App.4th 1667, 1678 (*Goodman*).)

In reviewing the trial court's finding that Shartsis suffered from a delusion under which he lacked capacity to execute the 2009 Will, we apply a substantial evidence standard of review. (*Goodman*, *supra*, 25 Cal.App.4th at p. 1678.) "In our review for substantial evidence, we look at the evidence in support of the successful party, disregarding the contrary showing. . . . All conflicts in the evidence are resolved in favor of the respondent. All legitimate and reasonable inferences are indulged in order to uphold the verdict if possible." (*Ibid*., citation omitted.)

2. *Applicable Law*

Under Probate Code section 6100.5 (hereafter, section 6100.5), a person is not mentally competent to make a will if, at the time he executes the will, among other things, "[t]he individual suffers from a mental disorder with symptoms including delusions or hallucinations, which delusions or hallucinations result in the individual's devising property in a way which, except for the existence of the delusions or hallucinations, the individual would not have done." (*Id*., subd. (a)(2).)

The original version of section 6100.5 was enacted in 1985. (*Goodman*, *supra*, 25 Cal.App.4th at p. 1676, citing legislative history.) "[T]he language and legislative history of section 6100.5 demonstrate that the statute was intended to closely adhere to the common law decisions as it pertained to testamentary capacity." (*Id*. at p. 1677.) Thus, "[t]o the extent that the language of section 6100.5 presents any ambiguity with respect to delusions and the level of proof required, . . . the statute was basically tracking the law as

20

applied in California prior to its enactment."  (*Id.* at p. 1676.)  Among other things, the legislative history states that " '[t]he purpose of this bill is to codify the standards for determining lack of testamentary capacity contained in *Estate of Perkins* (1925) 195 Cal. 699 . . . , and subsequent decisions.' "  (*Id.* at p. 1677.)

We accordingly turn to the case law to further define the term "delusion" as used in section 6100.5.  As we will explain, three fundamental principles govern the question of whether a false belief is a "delusion" within the meaning of section 6100.5.

### a.  *But-for Causation*

First, as explained in *Estate of Perkins*, *supra*, 195 Cal. 699 (*Perkins*), to establish lack of testamentary capacity based on a delusion, there must be a but-for causal relationship established between the testator's delusion and the making of the will.  "The evidence must establish that the will itself was the creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument.  The evidence must establish, in addition to the fact of the existence of the hallucinations or delusions, the fact that by reason of these hallucinations or delusions the testatrix devised or bequeathed her property in a way which, except for the existence of such delusions, she would not have done."  (*Id.* at p. 704.)

### b.  *Belief Not Based on Any Existing Facts*

Second, no delusion exists within the meaning of section 6100.5 when the testator's irrational and false belief nevertheless has *some* basis in fact.

21

"An insane delusion has been defined to be the conception of a disordered mind which imagines facts to exist of which there is no evidence and the belief in which is adhered to against all evidence and argument to the contrary, and which cannot be accounted for on any reasonable hypothesis. 'One cannot be said to act under an insane delusion if his condition of mind results from a belief or inference, however irrational or unfounded, drawn from facts which are shown to exist.' " (*Estate of Putnam* (1934) 1 Cal.2d 162, 172 (*Putnam*).)  Thus, " '[i]f there is any evidence, however slight or inconclusive, which might have a tendency to create a belief, such belief is not a delusion.' " (*Estate of Alegria* (1948) 87 Cal.App.2d 645, 655 (*Alegria*).)  Under this rule, "even if one's beliefs are inaccurate, a mistaken belief does not justify overturning a will *where there is any evidence supporting the belief*." (*Goodman*, *supra*, 25 Cal.App.4th at p. 1676, italics added.)

   c.  *The Testator's Belief Regarding the Quality of His Relationship with Family Members Does Not Qualify as Delusion*

Third, a testator's mistaken and irrational belief about the *quality* of his relationship with family members does not constitute the type of delusion sufficient to establish lack of capacity to make a will under section 6100.5.

In *Perkins*, the testatrix bequeathed the small sum of $250 to each of two siblings who resided in Iowa, with the bulk of her estate going to "a young man whom the decedent met some two years prior to her death." (*Perkins*, *supra*, 195 Cal. at p. 702.) The siblings challenged the will, contending that the testatrix lacked capacity at the time she executed the will.  Specifically, as *Perkins* explained, "Contestants, in support of their

contention that the testatrix was of unsound mind generally, and at the time of the making of the will, rely chiefly upon the alleged 'unwarranted' belief of the testatrix that her relatives were not interested in her and that they would be glad to hear of her death. This belief, it is argued, was an insane delusion, which resulted in an antipathy to her relatives and prompted and influenced her in the making of the will." (*Id*. at p. 708.)

*Perkins* rejected the argument, explaining "[t]he fact that the relatives of the testatrix *in their own minds* held nothing but the most friendly feelings toward the testatrix will not suffice to warrant the conclusion that because the testatrix believed, mistakenly, perhaps, that the relatives were in fact unfriendly, she was the victim of an insane delusion . . . ." (*Perkins*, *supra*, 195 Cal. at p. 709, citation omitted, italics added.) As *Perkins* pointed out, " 'Prejudices, dislikes, and antipathies, however ill-founded, or however strongly entertained, cannot be classed as insane delusions, nor is every delusion an insane delusion.' . . . [¶] Care must be taken to differentiate between mere unreasonable opinions and mental derangements. Testamentary capacity does not depend upon the testatrix's ability to reason logically or upon her freedom from prejudice. A belief may be illogical or preposterous, but it is not therefore evidence of insanity." (*Id*. at p. 708.)[10] Therefore, the testatrix's "belief as to the lack of cordiality in the relations

---

[10] Earlier case authority from our Supreme Court is in accord. For example, as explained in *Estate of Hess* (1920) 183 Cal. 589 (*Hess*), " 'The likes and dislikes of human beings — their confidences and mistrusts — are often capricious and arbitrary; but they are not evidences of insanity because they cannot be logically defended to the satisfaction of those who think them wrong. . . . "The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasoning." ' " (*Id*. at p. 596.) In *Estate of Calef* (1903) 139 Cal. 673 (*Calef*) our

23

of herself and her eastern relatives *was not a delusion in the usual and legal acceptation of the term*." (*Perkins*, at p. 708, italics added.) *Perkins* explained that a belief in the quality of a familial relationship does not constitute a delusion sufficient to establish incapacity because "[t]he existence of cordial relations depends upon the attitude of both parties. It may well have been that the [contestant] entertained none but the most kindly feelings toward her sister. This is not incompatible with the fact that the testatrix may not have reciprocated those feelings. And if she did not, she was justified in her belief that cordial relations did not exist between herself and her [sibling]." (*Ibid*.)

*Perkins*'s holding that an irrational belief about the quality of a testator's relationship with family members is insufficient to establish lack of capacity continues to be a fundamental principle of our probate law. As recognized by Witkin, citing *Perkins* and *Hess* as support, "[p]rejudices or false beliefs concerning relatives" are not regarded as sufficient to establish incompetency to make a will. (14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 125, subd. (5), p. 189.) The court in *Alegria*, *supra*, 87 Cal.App.2d 645, summarized the controlling law as follows: "Capricious and

---

Supreme Court disapproved of a jury instruction which told "the jury, substantially, that if the testatrix, at the time she made the codicil had a certain belief as to the affection and sincerity of the contestant, and that the latter cared only for her property, etc., and that the jury thought that said belief was 'without foundation in fact,' and not based on 'any information or evidence on the subject communicated to her,' then the jury should find" she was suffering from a delusion. (*Id*. at p. 675.) The court explained that a delusion could not be established merely "[b]ecause the testatrix had a belief as to the affection, motives, etc., of another person, which the jury thought was not founded in fact, and on evidence or information communicated to her," as "[t]he sanest of people have notions as to the character of the feelings, etc., of others, which many people would consider unfounded." (*Ibid*.)

24

arbitrary likes, dislikes and mistrusts are not evidence of unsoundness of mind. . . . 'Prejudices, dislikes, and antipathies, however ill-founded, or however strongly entertained, cannot be classed as insane delusions, nor is every delusion an insane delusion.' . . . The fact that a person dislikes his relatives, with or without reason, is not necessarily proof of unsoundness of mind. . . . 'People may hate their relatives for bad reasons, and yet not be deprived of testamentary power.' . . . A testatrix 'has the right to make an unjust, or an unreasonable, or even a cruel will, and that no will may be legally set aside upon the mere establishment that it is such a will.' . . . 'Irritability and bad temper may result in unnatural actions, but they are not inconsistent with testamentary capacity.' " (*Id*. at pp. 655-656.)

3. *Substantial Evidence Does Not Support the Trial Court's Finding That Shartsis Suffered from a Delusion Within the Meaning of the Probate Code*

a. *Evidence That Shartsis Believed Gary and Linda Loved Him Only for His Money Does Not Support a Finding That Shartsis Suffered from a Delusion Because Such a Belief Is About the Quality of a Familial Relationship*

As we have explained, the trial court accepted Trader's opinion that Shartsis was under a delusion that he had no "good" relationship with his children, citing evidence that Gary and Linda *did* love their father and were *not* just interested in his money. As expressed by the trial court, Shartsis's delusion took the form of an irrational belief that "he had no relationship with his children, that his children were the vultures and money hungry children that he would say they were," "that all [they] were after was his money, . . . that [they] didn't love him, [and] that [they] didn't like him." Put simply, the trial court found that Shartsis was under a delusion that his children were not close to him and

25

did not love him, which grew out of his suspicion that they were primarily interested in his money and were not interested in building a relationship with him.

Based on the long-standing case law we have cited above, however, a testator's mistaken and irrational belief about the *quality* of his relationship with family members and the sincerity of their affection simply does not constitute a delusion sufficient to establish lack of capacity to make a will under section 6100.5. (*Perkins*, *supra*, 195 Cal. at pp. 708-709; *Hess*, *supra*, 183 Cal. at p. 596; *Alegria*, *supra*, 87 Cal.App.2d at pp. 655-656.) As in *Perkins*, "[t]he fact that the relatives of [Shartsis] in their own minds held nothing but the most friendly feelings toward [him] will not suffice to warrant the conclusion that because [Shartsis] believed, mistakenly, perhaps, that the relatives were in fact unfriendly, [he] was the victim of an insane delusion." (*Perkins*, at p. 709, italics added.) As in *Calef*, Shartsis's "belief as to the affection and sincerity of [Gary and Linda], and that [they] cared only for [his] property" does not constitute a delusion sufficient to establish a lack of capacity because they are "belief[s] as to the affection, motives, etc., of another person." (*Calef*, *supra*, 139 Cal. at p. 675.)

Shartsis's belief that Gary and Linda were interested in him only because of his money, and thus had no real relationship with him, may have been " 'capricious and arbitrary,' " may not have been able to be " 'logically defended to the satisfaction of those who think them wrong' " (*Hess*, *supra*, 183 Cal. at p. 596), and may even have been "illogical or preposterous" (*Perkins*, *supra*, 195 Cal. at p. 708), but it is "not a delusion in the usual and legal acceptation of the term" (*ibid*.). Therefore, the trial court's finding

26

that Shartsis suffered from a delusion within the meaning of section 6100.5 is not supported by substantial evidence.

      b.      *Shartsis's Beliefs About the His Relationship with Gary and Linda Does Not Constitute a Delusion Because Those Beliefs Could Have a Basis in Fact*

The trial court's finding that Shartsis suffered from a delusion regarding his children also fails to support a finding that Shartsis lacked testamentary capacity because Shartsis's belief could have had some basis in fact and thus was not a wholly irrational delusion within the meaning of section 6100.5.

As the case law cited above establishes, "[E]ven if one's beliefs are inaccurate, a mistaken belief does not justify overturning a will where there is *any* evidence supporting the belief." (*Goodman*, *supra*, 25 Cal.App.4th at p. 1676, italics added.) This rule applies when the belief is based on evidence "however slight, or inconclusive." (*Alegria*, *supra*, 87 Cal.App.2d at p. 655.)

For one thing, the evidence presented at trial establishes a possible factual basis for Shartsis's belief that Gary and Linda were, as the trial court described, "money hungry" and "vultures" who were interested in him for his money. Specifically, the record contains evidence that Shartsis was disturbed by his children's behavior after his ex-wife died, as he perceived them as fighting over her estate and acting like "vultures." Based on that experience, Shartsis could have formed the belief that his children were just as interested in his money as their mother's and that they kept in contact with him mainly for that reason.

27

In addition, the evidence at trial establishes a possible factual basis for Shartsis's belief, as described by the trial court, that Gary and Linda "didn't love him" and "didn't like him." As to Gary, the evidence showed that there were several instances around the execution of the 2009 Will, during which Shartsis broke off contact with Gary for reasons that may have seemed petty to a neutral observer, such as disputes over tipping and the amount of ice to put in a soda, but were apparently very important to Shartsis. Those conflicts between Gary and Shartsis could have formed the basis for Shartsis's belief that Gary did not like or love him. As to Linda, although there is no evidence of the level of conflict between Linda and Shartsis as between Gary and Shartsis, it is apparent from Linda's testimony regarding Shartsis's personality and behavior and that she considered him to be an eccentric and self-centered person who was difficult to get along with. Although Linda testified that she loved her father despite his eccentricities, Shartsis could have perceived Linda's opinion of him and could have concluded, perhaps incorrectly, that Linda did not actually value having a relationship with him. Indeed, the evidence shows that for many years Shartsis chose to distance himself from Linda and not develop a close relationship. For example, he did not attend her wedding, did not visit her when he was in Lake Tahoe, and in later years did not keep her informed about his hospitalizations and surgeries.

In sum, because Shartsis's beliefs about the quality of his relationship with his children could have had some basis in fact, even if Shartsis may have reached illogical conclusions from those facts, the evidence in the record does not provide substantial

28

support for the trial court's finding that Shartsis suffered from a delusion about his relationship with his children within the meaning of section 6100.5.

> c. *Linda's Testimony that Shartsis Told Her That Gary Stole from Him Does Not Provide Sufficient Evidence to Support the Trial Court's Finding That Shartsis Suffered from a Delusion When Executing the 2009 Will*

Before concluding our review of the sufficiency of the evidence to support the trial court's finding that Shartsis lacked capacity to execute the 2009 Will, we focus on one additional item of evidence discussed by the parties and mentioned by the trial court.

During the trial court's lengthy remarks summarizing the evidence, the trial court referred to Linda's testimony in response to counsel's question whether, in "the last two or three years" of Shartsis's life, he ever mentioned the term " 'dementia' " to her. According to Linda, during a telephone call on an unspecified date, the following conversation occurred between her and Shartsis: "He described a situation that was nonsensical to me, and he had mentioned something about my brother stealing something from him. And I said, Dad, you need to rethink this. I said, Gary would never steal from you. And he said, Oh, he entered my home in a big, long, black coat, and it was in the middle of summer. I said, Dad, Gary doesn't wear big, long, black coats. He said, He entered my house and he stole money. I said, Dad, let's talk about this. Where was your money? He said, it was on the bed. I said, Dad, you don't leave money on your bed. How much money was there? He said, I think it was $4,500. I said, And when Gary left in his big, black coat how much money was there? And he said, $3,000. And I said, Dad, what

29

you're saying doesn't make sense. Gary doesn't want your money, and Gary wouldn't do this. Gary loves you. And he said, Well, I am getting dementia."

For several reasons, this testimony does not provide substantial evidence for the trial court's finding that Shartsis was suffering from a delusion regarding his relationship with his children within the meaning of section 6100.5 when he executed the 2009 Will.

First, Linda did not specify when the conversation occurred. Although Linda's testimony was in response to a question directing her to the period during "the last two or three years" of Shartsis's life, that time frame spans the dates of September 2008 to September 2011. There is no basis to conclude that the conversation took place prior to Shartsis's execution of the 2009 Will in April 2009. Linda and Gary "had the burden of proving [Shartsis] was delusional *at the time of executing the will*." (*Goodman*, *supra*, 25 Cal.App.4th at p. 1678, italics added.) Because Gary and Linda failed to present evidence that the telephone conversation occurred before the execution of the 2009 Will, they have not met their burden to establish that Shartsis was suffering from a delusion concerning Gary during the relevant time period.

Second, to qualify as a delusion a belief must be "adhered to against all evidence and argument to the contrary" (*Putnam*, *supra*, 1 Cal.2d at p. 172), and " '[i]t must be a delusion of such character that no evidence or argument will have the slightest effect to remove.' " (*Alegria*, *supra*, 87 Cal.App.2d at p. 655.) Here, Linda's own testimony established that Shartsis immediately responded in a positive manner to evidence and argument that called into question his irrational belief. Rather than defending the irrational belief, he responded by telling Linda that he was getting dementia.

30

Finally, evidence that Shartsis believed that Gary stole from him is not sufficient to support a finding that Shartsis's belief was a but-for cause of his decision to exclude Linda and Gary from the 2009 Will, regardless of when Shartsis held that belief. The 2009 Will excluded both Gary *and* Linda as beneficiaries. However, Shartsis's belief that Gary stole from him provides no basis for his decision to exclude Linda as well as Gary. Under the circumstances, Shartsis's belief that Gary stole from him could not have been a but-for cause of his decision to omit *both* Gary and Linda from the 2009 Will and therefore does not, in itself, provide substantial evidence to support the trial court's finding that Shartsis was suffering from a delusion regarding his children, without which he would not have executed the 2009 Will.

D. *Disposition of Ho's Appeal*

For the reasons set forth above, we conclude that substantial evidence does not support the trial court's finding that Shartsis was suffering from a delusion within the meaning of 6100.5 at the time he executed the 2009 Will. Accordingly, we will reverse the trial court's order granting Gary and Linda's Contest and denying Ho's Petition.

III.

GARY AND LINDA'S CROSS-APPEAL

Gary and Linda filed their Contest in November 2011 alleging lack of capacity, undue influence and fraud. Ho filed a motion for summary judgment in March 2012 as to all three causes of action. The trial court granted summary adjudication on the undue influence and fraud causes of action.

31

In their cross-appeal, Gary and Linda challenge the trial court's summary adjudication on the undue influence and fraud causes of action, contending that (1) the trial court's ruling was insufficient because it did not provide an adequate statement of reasons, and (2) Ho did not meet his burden to establish that there were no triable issues of fact.

A.      *The Trial Court Did Not Prejudicially Err in Setting Forth Its Statement of Reasons*

As a preliminary matter, we consider Gary and Linda's contention that the summary adjudication ruling should be reversed because the trial court did not sufficiently explain the reason for its decision.

At the hearing on the summary judgment motion on December 17, 2012, the trial court announced its tentative ruling to grant summary adjudication as to the undue influence and fraud causes of action.  After hearing argument from the parties, the trial court indicated that it would follow its tentative ruling:  "I don't think as to the second grounds there's enough evidence of direct influence, so I am going to sustain the objection as to undue influence, which is the second cause of action, and issue three, defraud."  The trial court's subsequent written order granting summary adjudication simply states as to both causes of action that "there is no triable issue as to any material fact."

Code of Civil Procedure section 437c, subdivision (g) provides in relevant part: "Upon the grant of a motion for summary judgment on the ground that there is no triable issue of material fact, the court shall, by written or oral order, specify the reasons for its

32

determination.  The order shall specifically refer to the evidence proffered in support of and, if applicable, in opposition to the motion which indicates that no triable issue exists. The court shall also state its reasons for any other determination.  The court shall record its determination by court reporter or written order."

Arguably, the trial court failed to fully comply with Code of Civil Procedure section 437c, subdivision (g), as it set forth only a very cursory explanation for its ruling which did not refer to any specific evidence and simply explained that there was not "enough evidence of direct influence."

Despite the trial court's very brief explanation of the reasons for its ruling, we conclude that the failure to fully comply with Code of Civil Procedure section 437c, subdivision (g) does not require reversal.  "The trial court's failure to perform this statutory duty [set forth in Code of Civil Procedure section 437c, subdivision (g)], . . . does not *automatically* require a reversal. . . .  The de novo standard for appellate review of an order granting summary judgment frequently means the lack of a proper order constitutes harmless error."  (*Main Street Plaza v. Cartwright & Main, LLC* (2011) 194 Cal.App.4th 1044, 1057, italics added, citation omitted (*Main Street Plaza*).)  "[R]eversal for a failure to state reasons is not required if the failure was harmless 'since " '[i]t is the validity of the ruling which is reviewable and not the reasons therefore.' " '  . . .  If independent review establishes the validity of the judgment, then the error is harmless. . . .  An example of when a failure to state reasons would not be harmless is when the trial court has discretion to ignore a party's declaration that conflicts with the

33

party's deposition testimony." (*Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1146, citations omitted (*Byars*).)

Here, any deficiency in the trial court's statement of reasons was harmless error. It is clear from the trial court's brief statement that in granting summary adjudication it focused on the lack of evidence that Ho directly influenced Shartsis's execution of the 2009 Will. Our own independent review permits us to fully assess whether that decision is supported by the evidence presented in connection with the summary judgment motion. This is not a unique situation requiring reversal, such as where appellate review is stymied because it is not clear whether the trial court has exercised its discretion to ignore certain evidence (*Byars*, *supra*, 109 Cal.App.4th at p. 1146, citing *Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 449), or where it is not clear that the trial court even reached a ruling on a certain issue (*Main Street Plaza*, *supra*, 194 Cal.App.4th at p. 1058). Therefore, we conclude that any error by the trial court was harmless.

B.      *The Merits of the Summary Adjudication Ruling*

We next consider Gary and Linda's contention that the trial court improperly granted summary adjudication on the undue influence and fraud causes of action.

1.      *Standards Applicable to Motions for Summary Judgment and Summary Adjudication*

Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment or summary adjudication is to be granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. The moving

party "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) A moving party may rely on "the pleadings, competent declarations, binding judicial admissions contained in the allegations of the plaintiff's complaint, responses or failures to respond to discovery, and the testimony of witnesses at noticed depositions." (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1375.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar*, at p. 851.)

If the party's prima facie case is met, the burden shifts to the opposing party to show the existence of a triable issue of material fact with respect to that cause of action or defense. (*Aguilar, supra*, 25 Cal.4th at p. 849; *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261.) Ultimately, the moving party "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar*, at p. 850.)

We review summary judgment and summary adjudication rulings de novo to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.) "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." (*Lenane v. Continental Maritime of San Diego, Inc.* (1998) 61 Cal.App.4th 1073, 1079.) "[W]e are not bound by the trial court's stated reasons for its ruling on the motion; we review only the trial court's ruling

35

and not its rationale." (*Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1402.)[11]

2.      *Relevant Evidence Presented in the Summary Judgment Proceeding*

In support of his motion for summary judgment, Ho presented evidence relevant to the undue influence and fraud causes of action in the form of declarations, documentary evidence and deposition transcripts. The facts presented in connection with the summary judgment motion are generally consistent with the facts presented at trial, which we have set forth above. For the purposes of our review of the summary adjudication ruling, we elaborate on the evidence that is central to the issues of undue influence and fraud, as presented in connection with the summary judgment motion.

As we have explained, Shartsis and Ho became acquainted in 1982 when Ho purchased Pacific BMW next to Shartsis's auto repair business on the Brand Property. Ho began to lease a portion of the Brand Property in 1985. The lease was expanded in 1989 to include all of the Brand Property when Shartsis moved to Victorville. This landlord-tenant relationship between Shartsis and Ho continued from 1985 through Shartsis's death in 2011.

In 2002, Pacific BMW sought to construct a new building costing over $20 million that would be partially located on the Brand Property. Ho offered to buy the Brand

---

11      We note that the parties filed evidentiary objections in connection with the motion for summary judgment, but the record contains no indication that the trial court ruled on the objections. When "the trial court fails to rule expressly on specific evidentiary objections, it is presumed that the objections have been overruled." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.)

Property from Shartsis, but Shartsis preferred to enter into a long-term lease. Pacific BMW (through a limited liability company) therefore entered into a 99-year ground lease with Shartsis in October 2002, under which Pacific BMW agreed to pay $7,500 per month in rent, subject to Ho's personal guarantee. Ho also agreed to provide Shartsis with a leased BMW as part of the consideration for the ground lease. In connection with the ground lease, Shartsis executed a power of attorney appointing Ho or another executive at Pacific BMW as his agent to carry out tasks related to the planned construction on the Brand Property.

In 2006, Shartsis made an unsecured loan to Pacific BMW in the amount of $850,000. Later, Shartsis increased the amount of the loan to $1 million. The loan from Shartsis to Pacific BMW was renewed each year. Ho explained in his declaration and deposition that the loans were Shartsis's idea.

Beginning in 1986 Shartsis executed a series of wills in which he left some of his estate to Ho.

In the 1986 Will, Shartsis left one dollar to each of his three children and 35 percent of the residual estate to Ho, with the remainder of the estate going to Shartsis's siblings and to a friend. Shartsis did not discuss the 1986 Will with Ho before preparing it, and he told Ho after the fact that he had added him as a beneficiary of his will.

In the 1996 Will, Shartsis left his personal property and 20 percent of his residual estate to each of his three children and 40 percent of his residual estate to Ho. He also designated Ho as executor. Ho was not involved in Shartsis's preparation of the 1996 Will and received a copy after the fact.

37

In the 2001 Will, Shartsis left his personal property and 5 percent of his residual estate to each of his three children, and the Brand Property and 85 percent of his residual estate to Ho. Ho was once again designated as executor. Shartsis informed Ho that he was amending his will and sent Ho a copy.

In 2002, when the parties were discussing entering into the ground lease in connection with Pacific BMW's construction of its new building, it was decided that a limited liability company would be created to own and lease the real estate at issue. However, under the terms of the 2001 Will, Ho was to receive the Brand Property upon Shartsis's death only if Ho "or a corporation in which he is a majority shareholder" was leasing the Brand Property at the time of Shartsis's death. Because the new lease was to involve a limited liability company, not a corporation, an executive at Pacific BMW asked Shartsis to revise the 2001 Will to reflect the change in the form of entity.

Shartsis retained the same attorney who had prepared the 2001 Will to make the revisions reflected in the 2002 Will.[12] Apart from the revisions regarding the form of entity that could be leasing the Brand Property at the time of Shartsis's death, the dispositive provisions of the 2002 Will were identical to those in the 2001 Will. Counsel for Pacific BMW participated in providing Shartsis's attorney with proposed form-of-

---

[12] The 2002 Will provides that the Brand Property will go to Ho if "at the time of my death . . . [Ho] or a corporation, limited liability company, partnership or other form of entity in which [Ho] owns a majority interest, is then leasing said property from me, and said property is in the possession of an entity in which [Ho] owns a majority interest."

38

entity language.[13]  Ho was not involved in the drafting or execution of the 2002 Will, and he was not present when Shartsis executed the 2002 Will.

In January 2009, Shartsis wrote a letter to Ho stating that he intended to revise his will again and asking Ho "to help with my will."  Shartsis stated, "Here is my thinking. That all 3 children be removed and set it up for 10% to Steve Lindstrom and 90% to you . . . and that Gary get the personal property [at Shartsis's Victorville home], which includes everything but the BMW," so long as "[Gary] maintain[s] the property . . . for [one] year before you turn over the title."  In the letter, Shartsis tried to get Ho to "share the cost of adjusting the will as you know almost all that I have left will belong to you."  The letter stated, "I hope these changes will eliminate any problems that could be caused by my children to you.  As you know, you are my best friend [and] Steve does a lot to help you for me."  After sending the letter, Shartsis called Ho and told him that "he's changing his will again," and that Ho "should wait for the one in the mail again."  Ho did not offer any assistance to Shartsis in preparing the new will.

In April 2009, Shartsis sent Ho a letter explaining that he was "making a new will" and was sending Ho a copy before it was signed.  In the letter, Shartsis asked Ho to "check it out and make sure that it does not change the important parts that apply to you."

---

13    In connection with the summary judgment motion, the parties disputed whether Pacific BMW paid for the revisions reflected in the 2002 Will.  This disputed fact is not material to the issue of whether Ho exercised undue influence over Shartsis in 2009.  Although not before the court during the summary judgment motion, we note that Ho testified at trial that at Shartsis's request, he reimbursed Shartsis for $975 of the legal expenses incurred in making the technical revisions reflected in the 2002 Will.

Shartsis explained that "[a]ll the children are excluded to make sure that you will not have a problem handling the will. They are not honest and are my friends only for what they can get when I die. Gary is also excluded from the will for reasons that he has done to me personally." Shartsis explained to Ho that he was running out of time to execute the will before an upcoming surgery, and he wanted Ho "to call [him] to approve it."

After sending the draft will, Shartsis called Ho to tell him that "he was going to go sign the will" and to ask whether "I have any problem with it." Ho told Shartsis that he did not have any problem with the new will, and Ho may have commented, "Now you taking your kids out again?"

The draft will that Shartsis sent Ho in April 2009 was prepared by attorney Schauf, whom Shartsis located through a local newspaper advertisement. On April 15, 2009, Shartsis met with Schauf and told her that he wanted to make some changes to his will. Schauf interviewed Shartsis for about 30 to 45 minutes, including time to make sure that he understood what he was doing and was competent to prepare a will.

At the meeting, Shartsis gave Schauf handwritten notes reflecting the proposed changes, which specified, among other things, that he did not want to leave anything to his children. Schauf testified in her deposition that she specifically reviewed with Shartsis the fact that he did not want to give a gift to any of his children. Schauf was satisfied that Shartsis knew what he was doing and that his desire was to give no gift to his children. Further, based on her discussions with Shartsis, Schauf concluded that he was making the will based on his own views and not based upon what anybody was telling him to do.

40

After their initial meeting, Schauf mailed Shartsis a draft of the revised will for his review. Approximately two weeks later, on April 28, 2009, Shartsis returned to Schauf's office and executed the 2009 Will. Shartsis then sent Ho a copy of the executed will. Schauf had no contact or communication with Ho.

3.      *Applicable Law for Undue Influence Cause of Action*

We next examine the applicable legal standards for establishing undue influence sufficient to invalidate a will.

Probate Code section 6104 provides that the execution of a will is ineffective if procured by undue influence.[14] "Undue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96 (*Rice*).) "To overturn a will on the ground of undue influence, not only must there be evidence of activity on the part of the beneficiary, it also 'is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. . . . Evidence must be produced that pressure was brought to bear directly upon the testamentary act. . . . [M]ere opportunity to influence the mind of

_____

[14]      In 2013, a definition of "undue influence" was added to the Probate Code, stating that " '[u]ndue influence' has the same meaning as defined in Section 15610.70 of the Welfare and Institutions Code" but that "[i]t is the intent of the Legislature that this section supplement the common law meaning of undue influence without superseding or interfering with the operation of that law." (Prob. Code, § 86.) Welfare and Institutions Code section 15610.70 provides: "(a) 'Undue influence' means excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." It also lists a number of factors that may be considered in determining whether undue influence is present. (*Ibid*.)

41

the testator, even coupled with an interest or a motive to do so, is not sufficient.' " (*Estate of Lingenfelter* (1952) 38 Cal.2d 571, 586, citations omitted (*Lingenfelter*).) " ' "Before a testamentary document will be overthrown because of the exercise of undue influence, the proven circumstances must be inconsistent with voluntary action on the part of the testator." ' " (*Hagen v. Hickenbottom* (1995) 41 Cal.App.4th 168, 182.) "[U]ndue influence requires a showing that the testator's free will was overpowered ' " ' "at the very time the will was made." ' " ' " (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1354 (*Lintz*).)

" 'Direct evidence as to undue influence is rarely obtainable and hence a court or jury must determine the issue of undue influence by inferences drawn from all the facts and circumstances.' " (*Lintz, supra*, 222 Cal.App.4th at p. 1355.) Accordingly, "undue influence can be established by circumstantial evidence so long as the evidence raises more than a mere suspicion that undue influence was used; the circumstances proven must be inconsistent with the claim that the will was the spontaneous act of the testator." (*Estate of Franco* (1975) 50 Cal.App.3d 374, 382 (*Franco*); see also *Estate of Welch* (1954) 43 Cal.2d 173, 178 (*Welch*) ["It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence; but before the will can be overthrown the circumstances must be *inconsistent* with voluntary action on the part of the testator."].)

"The indicia of undue influence have been stated as follows: '(1) The provisions of the will were unnatural[;] (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations

42

existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; and (5) the chief beneficiaries under the will were active in procuring the instrument to be executed.' " (*Lingenfelter*, *supra*, 38 Cal.2d at p. 585.)

In *Lingenfelter*, our Supreme Court concluded that even though the record contained evidence of most of the other possible indicia of undue influence, because there was no evidence of *active procurement* by the beneficiary, the evidence was not sufficient to establish undue influence. (*Lingenfelter*, *supra*, 38 Cal.2d at p. 586 ["there still is no proof of undue influence" because "[e]vidence of activity by [the beneficiary] in procuring execution of the will is entirely lacking"].) As noted in *Franco*, *supra*, 50 Cal.App.3d 374, even if the other factors enumerated in *Lingenfelter* are shown, there must still be "circumstantial evidence giving rise to the inference that the relationship existing between the chief beneficiary and decedent offered the former *the opportunity to control* the testamentary act *and* that the chief beneficiary was *active in procuring* the instrument to be executed." (*Franco*, at pp. 385-386, italics added; see also *Estate of Robbins* (1959) 172 Cal.App.2d 549, 555 (*Robbins*) [nonsuit was properly granted on undue influence claim when there was evidence of "confidential relationship, motive, opportunity and perhaps an unnatural quality of the will" but "there was a complete lack of proof of procurement"]; *Estate of Graves* (1927) 202 Cal. 258, 262 ["mere proof of opportunity to influence the mind of the testatrix, even though shown to be coupled with interest, or a motive to do so, does not sustain a finding of undue influence, in the

43

absence of testimony showing that there was pressure operating directly on her testamentary act"].)

Under limited factual circumstances, undue influence may also be established at trial by use of a presumption. "[U]nder certain narrow circumstances, a presumption of undue influence may arise, shifting to the proponent of the disposition the burden of proving by a preponderance of the evidence that the donative instrument was *not* procured by undue influence. This will occur only if *all* of the following elements are shown: (1) the existence of a confidential relationship between the party making the donative transfer and the person alleged to have exerted undue influence; (2) active participation by the latter in the actual preparation or execution of the donative instrument; and (3) the receipt by that person of undue profit from the executed instrument." (*Conservatorship of Estate of Davidson* (2003) 113 Cal.App.4th 1035, 1059-1060 (*Davidson*).)

4. *Summary Adjudication Was Properly Granted on the Undue Influence Cause of Action*

a. *The Circumstantial Evidence Does Not Create a Triable Issue of Material Fact as to Undue Influence*

Gary and Linda's first argument is that summary adjudication was improperly granted on the undue influence cause of action because the circumstantial evidence is sufficient to support a finding that Ho exercised undue influence over Shartsis in the execution of the 2009 Will. We reject the argument.

As we have explained, at a minimum, the circumstantial evidence supporting a finding of undue influence must support (1) an "inference that the relationship existing

44

between the chief beneficiary and decedent offered the former the opportunity to control the testamentary act" and (2) "that the chief beneficiary was active in procuring the instrument to be executed." (*Franco*, *supra*, 49 Cal.App.3d at pp. 385-386.)

Here, no circumstantial evidence in the record supports an inference either that Ho had an opportunity to control Shartsis at the time of the 2009 Will *or* that Ho was active in the procurement of the 2009 Will.

As for Ho's opportunity to control Shartsis's execution of the 2009 Will, the undisputed evidence shows very limited involvement by Ho in the events leading up to the execution of the 2009 Will. The evidence establishes nothing more than that Ho received two letters from Shartsis within a few months of the execution of the 2009 Will and had two telephone conversations with him, both of which were initiated by Shartsis. There is no evidence that, in response to those letters, Ho made any substantive comments to Shartsis to influence the proposed amendments to the will. These limited interactions between Ho and Shartsis shown by the record come nowhere near to creating an inference that Ho had an opportunity to bring "pressure . . . directly on the testamentary act, sufficient to overcome the testator's free will." (*Rice*, *supra*, 28 Cal.4th at p. 96.) "Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will, must amount to coercion destroying free agency." (*Robbins*, *supra*, 172 Cal.App.2d at p. 554.)

As to active procurement, "[t]here must be activity by the beneficiary in the actual preparation of the will." (*Estate of Mann* (1986) 184 Cal.App.3d 593, 607.) The

45

undisputed evidence was that Shartsis initiated the idea of amending his will in 2009, located Schauf himself, and met with Schauf on his own to draft and execute the 2009 Will, without Ho present. Based on those facts, there is no basis for a finding of active procurement. (See, e.g., *Lingenfelter*, *supra*, 38 Cal.2d at p. 586 ["Active participation in procuring the execution of the will cannot be inferred from the fact that [beneficiary] accompanied [testatrix] to [attorney's] office, in the absence of any indication that [testatrix] went there at [beneficiary's] instigation or request, or that [testatrix] was not acting entirely in accord with her own desire."].) Here, "[t]here is absolutely no evidence [Ho] in any way affected the dispositive contents of the will, and ' "[a] will cannot be overturned on the mere speculation or suspicion that undue influence may have been used to procure it." ' " (*Mann*, at pp. 608-609.)

Gary and Linda devote much of their briefing of the undue influence cause of action to a discussion of events surrounding the execution of the 2002 Will. They argue that Ho *did* participate in procuring the 2002 Will because he or his representative at Pacific BMW asked Shartsis to make a technical change to that document to amend the type of entity that could be leasing the Brand Property at the time of Shartsis's death. However, evidence regarding the 2002 Will has no relevance here, as Gary and Linda seek to invalidate the 2009 Will, not the 2002 Will. As we have explained, "undue influence requires a showing that the testator's free will was overpowered ' " ' "at the very time the will was made." ' " ' " (*Lintz*, *supra*, 222 Cal.App.4th at p. 1354.) For that reason, evidence of what happened in 2002 does not inform our analysis as to whether Gary and Linda have established Ho's undue influence in the execution of the 2009 Will.

46

Moreover, even if Ho's participation in the 2002 Will was somehow pertinent here, the evidence in the record is not sufficient to support a finding that Ho's involvement in 2002 amounted to influence that "destroy[ed] the testator's free agency" (*Lingenfelter*, *supra*, 38 Cal.2d at p. 586) and thus does not establish that Ho ever exercised undue influence over Shartsis as to *any* testamentary document. As of the time of the 2002 Will Shartsis had already, without any involvement from Ho, made a bequest to Ho of the Brand Property in the 2001 Will. The only reasonable interpretation of the evidence is that the changes reflected in the 2002 Will were made *to insure that Shartsis's pre-existing testamentary intention would be carried out*, and would not be inadvertently stymied by Pacific BMW's change in the form of entity that would be leasing the Brand Property.

We accordingly reject Gary and Linda's contention that the circumstantial evidence before the trial court in connection with the summary judgment motion was sufficient to create a triable issue of fact as to whether Ho exercised undue influence over Shartsis in the execution of the 2009 Will. There is no factual basis for a trier of fact to conclude that the circumstances surrounding Ho's involvement with the 2009 Will were "*inconsistent* with voluntary action on the part of [Shartsis]" in executing that document. (*Welch*, *supra*, 43 Cal.2d at p. 178.)

> b. *The Evidence Does Not Create a Presumption of Undue Influence*

Apart from contending that circumstantial evidence showed that Ho exercised undue influence over Shartsis's execution of the 2009 Will, Gary and Linda also argue that they presented evidence sufficient to create a *presumption* of undue influence.

47

As we have explained, a party may establish a presumption of undue influence at trial when three elements are present: "(1) the existence of a confidential relationship between the party making the donative transfer and the person alleged to have exerted undue influence; (2) active participation by the latter in the actual preparation or execution of the donative instrument; and (3) the receipt by that person of undue profit from the executed instrument." (*Davidson*, *supra*, 113 Cal.App.4th at pp. 1059-1060.)

Without even considering the other two of the three elements required to establish a presumption of undue influence, we reject Gary and Linda's argument because the element of active procurement is missing. As we have detailed above, the record contains no evidence of any "active participation by [Ho] in the actual preparation or execution of the [2009 Will]." (*Davidson*, *supra*, 113 Cal.App.4th at p. 1060.)

5.      *Applicable Law for Fraud Cause of Action*

We next consider the legal principles applicable to the fraud cause of action.

Under Probate Code section 6104, a will is ineffective to the extent it is procured by fraud. "In cases where fraud alone is relied upon as a ground of contest it is the theory of the law that the testator, even though acting, in a manner of speaking, of his own free will, was, nevertheless deceived by false data into doing that which he would not have done had he not been fraudulently imposed upon." (*Estate of Newhall* (1923) 190 Cal. 709, 718.) "[F]alse representations . . . have been held to constitute fraud if it can be shown that they were designed to and did deceive the testator into making a will different in its terms from that which he would have made had he not been misled." (*Ibid.*) "The elements of fraud in the procurement of a testamentary instrument are the same as those

48

required to vitiate a contract. 'One of the necessary elements is an intent to deceive the decedent or an intent to induce decedent to execute his will.' " (*David v. Hermann* (2005) 129 Cal.App.4th 672, 685-686.)

  6. *Summary Adjudication Was Properly Granted on the Fraud Cause of Action*

  With respect to the fraud cause of action, Ho's summary judgment motion argued that Gary and Linda had not identified any false representation made by Ho that induced Shartsis into entering into the 2009 Will. In their opposition briefing in the trial court and again on appeal, Gary and Linda devote very little discussion to their fraud cause of action and fail to point to any representation by Ho that could serve as the basis for that cause of action.

  Because Gary and Linda have not met their burden to present evidence of any false representations by Ho that could have induced Shartsis to enter into the 2009 Will, we conclude that summary adjudication was properly granted as to the fraud cause of action.

DISPOSITION

As to Ho's appeal, the trial court's order granting the Contest and denying the Petition is reversed.  As to Gary and Linda's cross-appeal, the trial court's order granting summary adjudication as to the undue influence and fraud causes of action is affirmed. Ho is to recover his costs on the appeal and cross-appeal.


IRION, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.

50